**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LEWIS A. BIANCHI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 12 C 0364 |
| vs. | ) | |
| | ) | Magistrate Judge Rowland |
| HENRY C. TONIGAN, III, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Louis A. Bianchi, the State's Attorney of McHenry County, and three of his employees (collectively, "Plaintiffs") bring this action against Defendants Special State's Attorney Thomas K. McQueen and Quest Consultants International and some of its employees (collectively, "Quest"), alleging that Defendants conspired to fabricate false criminal charges and prosecute Bianchi and his employees without probable cause or credible evidence.[1]

On May 23, 2012, Quest produced approximately 17,002 pages of documents to Plaintiffs. The parties now disagree about whether the vast majority of these documents should be treated as "confidential" under the parties' agreed Protective Order. Quest has filed a Motion to Enforce Designation of Documents as Confidential Under the Protective Order (Dkt. 99 and Dkt. 121). For the reasons stated below, the Court denies Quest's Motion to Enforce.

## I.    Factual Background

---

[1] On November 9, 2012, Plaintiffs dismissed Defendant Henry C. Tonigan, III, with prejudice (Dkt. 176).

This litigation arises out of the 2011 investigation and indictment of Louis Bianchi, the McHenry County State's Attorney, as well as some of his employees, for various alleged acts of official misconduct, including use of county resources for political purposes and preferential treatment of certain criminal defendants. Bianchi and his employees were ultimately acquitted of all charges, and on January 18, 2012, they filed suit against the people who investigated and prosecuted them, alleging they engaged in a politically and financially motivated conspiracy to remove Bianchi from office. The particular Defendant most relevant to this Motion is Quest Consultants International, a private investigation firm hired by the special prosecutors to investigate Bianchi.

On May 23, 2012, pursuant to Federal Rule of Civil Procedure 26(a)(1)(A), Quest produced approximately 17,002 pages of documents. The parties have described that production as consisting of three categories of documents: (1) email communications between and among Quest employees regarding their investigation of Bianchi; (2) Quest billing records related to the investigation; and (3) interview reports prepared by Quest employees during their investigation. The parties agreed to treat the documents as confidential until a protective order was negotiated and entered by the Court.

On June 20, 2012, the District Court entered the parties' agreed Protective Order (Dkt. 93). The Order permits the producing party to designate documents as "confidential," which is defined as "sensitive, personal and/or proprietary information that is treated as confidential." (*Id*. at 2). The Protective Order restricts

the use of confidential material including not allowing a witness to see confidential material without signing a declaration of intent to be bound by the Protective Order (*id.* at 6, 13), and requiring any pleading containing confidential information to be filed under seal (*id.* at 4-5).

The Protective Order also provides a mechanism for challenging a parties' confidentiality designation for lack of good cause:

> A party may challenge the propriety of a designation by another party of material or testimony as Confidential within a reasonable period of time after receipt or designation of the material or testimony designated as Confidential by giving written notice of such challenge to all parties. The party asserting the material or testimony as Confidential shall then have seven (7) days to either remove the Confidential designation or to file a motion in court alleging good cause for the Confidential designation.  The party making the designation shall have the burden of proving the propriety of such designation...."

(*Id.* at 7).

On June 26, 2012, pursuant to the Protective Order, Quest formally designated its entire May 23, 2012 production as confidential. Three days later, on June 29, 2012, Bianchi's counsel objected to that designation, asserting that "none of the documents produced contain 'confidential information' as defined in the Protective Order" (Dkt. 121-7).

Quest filed an initial Motion to Enforce Designation of Documents as Confidential on July 6, 2012. The District Court referred that Motion to Magistrate Judge Nolan (Dkt. 107), who ordered the parties to continue to meet and confer in good faith (Dkt. 108). The parties were able to narrow the scope of their dispute after Plaintiffs agreed that the reports relating to background investigations and credit checks—known as "IRB reports"—were properly designated as confidential.

3

Whether or not the email correspondence, Quest's billing records, and non-IRB witness interview reports constitute confidential information under the Protective Order remains in dispute.

In July 2012, a number of articles about this litigation appeared in area newspapers and news-related blogs. Quest contends that those publications contain "unauthorized leaks and disclosures" of information from their May 23 production (Dkt. 121 at 3). Quest also contends that the articles show that "Plaintiffs' attorney is sharing information regarding documents produced by Quest with the media...." (*Id.*). In addition to the news articles, on July 24, 2012, Quest's counsel received a voicemail message from Harry Heitzman, a reporter from the *Daily Herald* newspaper, asking about Plaintiffs' partial settlement with Quest's co-defendant Henry Tonigan III. According to the Defendant, the reporter stated, in part, "I...did talk with the Plaintiff's attorney for Mr. Bianchi, Terry Ekl. Mr. Ekl said that he believes that the case against Quest and McQueen is growing stronger and stronger every day as more documents are released in discovery." (Dkt. 121 at 4).

Thereafter, and without seeking leave of court, Quest filed an amended version of its Motion to Enforce Documents as Confidential (Dkt. 121). Plaintiffs moved to strike that Amended Motion (Dkt. 122). In lieu of ruling on the motion to strike Quest's amended pleading, Judge Nolan extended the time in which Bianchi had to respond (Dkt. 124).

## II.     Discussion

In this case, a major point of contention between Quest and Bianchi is

whether unfiled discovery is presumptively private or presumptively public.[2] In the context of the present dispute, however, the question is largely theoretical. The more pertinent issue is whether Quest has established "good cause" for the Court to protect the contested documents as provided for by the Protective Order.

In support of its Motion, Quest contends that it has established good cause to treat the documents as confidential, but devotes very little attention to the actual content of the documents at issue. Instead, Quest focuses on the context surrounding the May 23 production (*i.e.*, the subsequent media attention and the negotiations relating to the Protective Order), and argues that: (1) enforcement of the confidentiality designation is necessary to prevent a "trial by media" in this case; and (2) the documents should be treated as "confidential" because the parties entered into a binding agreement to treat the production as confidential.

### A.  Good Cause to Treat the Documents as Confidential

The Federal Rules of Civil Procedure provide that "for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way...." Fed. R. Civ. P. 26(c). A party seeking a protective order under Rule 26(c) bears the burden of demonstrating good cause. Fed. R. Civ. P. 26(c)(7). To successfully carry

---

[2] Indeed, there is conflicting case law on that question. *Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858 (7th Cir. 1994) (unless prohibited by a protective order, a party can disseminate materials obtained in discovery); *but cf. Bond v. Utreras*, 585 F.3d 1061, 1074–76 (7th Cir. 2009) (there is no implied right of public access to unfiled discovery).

the burden of establishing good cause, a party must demonstrate a particular need for protection. There must be evidence that a clearly defined and serious injury will result otherwise. 8 C. Wright & A. Miller, *Federal Practice And Procedure* § 2035, at 265 (1970); *see Anderson v. Cryovac, Inc.,* 805 F.2d 1, 7 (1st Cir. 1986); *United States v. Exxon Corp.,* 94 F.R.D. 250, 251 (D.D.C. 1981); *United States v. Hooker Chem. & Plastics,* 90 F.R.D. 421, 425; *Reliance Ins. Co. v. Barrons,* 428 F. Supp. 200, 202–03 (S.D.N.Y. 1977). Where, as here, a party is seeking protection with respect to confidential business information, it must demonstrate that the information sought to be protected is, indeed, confidential and that disclosure might be harmful to its business. *American Standard Inc. v. Pfizer Inc.,* 828 F.2d 734, 740 (Fed.Cir. 1987); *Exxon,* 94 F.R.D. at 251; *Parsons v. General Motors Corp.,* 85 F.R.D. 724, 726 (N.D. Ga. 1980); *United States v. IBM Corp.,* 67 F.R.D. 40, 46 (S.D.N.Y. 1975).

### 1.  Quest Emails

Quest argues that there is good cause to treat the email communications between and among Quest employees regarding their investigation of Bianchi as confidential because they are "without question" proprietary work-product generated in preparation for the underlying criminal matters. In response, Plaintiffs do not respond to Quest's proprietary work-product argument, but assert that the emails are relevant because they (1) contradict Defendant McQueen's claims of absolute immunity, and (2) establish the conspiracy among the Defendants. The relevance of the emails is not in dispute, the only question is

whether they are confidential as defined by the Protective Order.

It is not entirely clear whether Quest is asserting a privilege over its proprietary methods or asserting a privilege under the attorney work product privilege. (*Compare* Dkt.121 at 13 (disclosure of Quest's strategy will result in a "chilling effect upon Quest's future practices") *with id.* at 11 ("all information contained within these emails is without question proprietary work product generated in preparation for the underlying criminal matters"). If the former, the Court has carefully reviewed the handful of emails, attached under seal to Plaintiffs' response, (Dkt. 134 Ex. C), and does not find any of them to threaten disclosure of Quest's strategy so as to have "a chilling effect upon Quest's future practices and investigators practices" (Dkt. 121 at 11).

If Quest is relying on the attorney work-product privilege, although neither party addresses this issue, a substantial body of case law holds that work-product protection is unavailable when a prosecutor, who conducted a criminal investigation, later claims the privilege to protect his work during a resulting civil lawsuit. *Wong v. Thomas,* 238. F.R.D. 548, 551 (D. N.J. Jan. 10, 2007) (holding that documents related to closed criminal investigation of state employee was not protected by work product privilege is employee's subsequent wrongful termination suit); *Howell v. City of New York,* No. CV-06-6347 (ERK)(VVP), 2007 WL 2815738, at *2 (E.D.N.Y. Sept. 25, 2007); *Ostrowski v. Holem,* No 02 C 50281, 2002 WL 31956039, at *4 (N.D. Ill. Jan. 21 2002); *Hernandez v. Longini,* No. 96 C 9203, 1997 WL 754041, at *2 (N.D. Ill. Nov. 13, 1997) ("Courts have expressly found the [work

product] privilege unavailable when a prosecutor in a prior criminal investigation later objects to discovery of her work product by a litigant in a related civil lawsuit—exactly the situation confronting the Court in this case."). This Court is not ruling on this question, but Quest has, without doubt, failed to establish good cause to treat nearly 17,000 pages of emails as confidential based upon a blanket assertion of the attorney work-product privilege.[3]

## 2. Quest Billing Records

Quest argues that the billing records included in its May 23 production should be kept confidential because those records are likely to cause Quest substantial embarrassment, annoyance, and loss of business. Quest does not attach any of the billing records to its pleadings. Nor does it explain what, in particular, about the records is likely to cause embarrassment. In response, Bianchi argues that the billing records cannot be deemed confidential because they have already been made part of the public record. Quest billing records were previously tendered to Plaintiffs' counsel pursuant to a subpoena in the underlying criminal proceedings, and they were also filed in the state court in relation to the appointment of the special prosecutors (McHenry County Case 09 MR 142) (Dkt. 134 at 7). There was no protective order in the underlying criminal cases, and the court file in Case 09 MR 142 was unsealed on March 9, 2012 (*id.).*[4]

---

[3] This Order does not prevent Quest from properly asserting a privilege with respect to specific documents. Plaintiffs' counsel indicated his willingness to negotiate proper privilege assertions in his email correspondence of July 3, 2012 (Dkt. 121-8 at 3).

[4] According to Quest's exhibits to its Motion, some of its billing records have already been posted on the McHenry County Blog (Dkt. 121-1 at 24-25).

In this case, Quest cannot show good cause because, even if the billing records were at some point "confidential," the records lost their confidentiality when they were filed, without any special judicial protection, in the underlying cases. Thus, the Court will not enforce Quest's confidentiality designations with respect to the billing records.

### 3.    Non-IRB Witness Interview Reports

As for the non-IRB witness interview reports, Quest argues that the reports should be treated as confidential because they relate to sensitive facts and circumstances of the underlying criminal investigation.[5] The Court finds that argument insufficient to support a finding of good cause in this case. The reports summarize interviews of individuals that were thought to be "key prosecution witnesses." Those witness statements were tendered to Bianchi in the underlying criminal proceeding. Also, because the underlying criminal investigation resulted in two public trials, the information contained in reports of interviews with "key witnesses" is presumably a part of the public record.  This fact distinguishes the cases cited by Quest (Dkt. 121 at 12). Quest has failed to explain how the information contained in the witness reports maintains its sensitivity even after the two highly-publicized trials in the underlying case.

### B.    Enforcement as Necessary to Avoid "Trial by Media"

---

[5] Quest also argues that the reports are confidential because the witnesses consented to be interviewed only under the assurances that the substance of those interviews would remain confidential (Dkt. 121 at 10-11).  Plaintiffs sent a Rule 11 safe harbor letter to Quest on August 3, 2012 demanding that Quest withdraw the statement.  In response, Quest admits that this statement was an "inadvertent misstatement of fact" (Dkt. 148 at 3 n.1; Dkt. 148-1 at 4).  Thus, the Court will not consider that element of Quest's argument.

Quest argues that the Court should endorse its confidentiality designations because Bianchi has already leaked confidential information to the press, and a court order is needed to prevent further leaks to the media.

Quest's contention that certain July 2012 news accounts "make it evident that Plaintiffs attorney is sharing information regarding documents produced by Quest" is without factual support (Dkt. 121 at 3). The Court has carefully reviewed the five post-production articles / blog posts Quest attached to its motion.[6] None contain any information leaked from the Quest documents. The newspaper articles, published between July 24 and July 26, 2012, each report the settlement by Defendant Tonigan, and contain information from the public docket and from non-party witnesses. The blog post from July 24, 2012, also triggered by the Tonigan settlement, essentially posts the Complaint filed publically in this case.[7] It is true that contained in the articles regarding the Tonigan settlement, Plaintiffs' counsel commented on his belief in the strength of the case against the remaining defendants and referenced the existence of the discovery in this case, but Plaintiffs' view of the impact of the discovery documents that are the subject of this motion is a matter of public record (Dkt. 134 at 6). The Court rejects the contention that

---

[6] *Bianchi Conspiracy Suit Ruling Expected in August*, July 4, 2012 (Dkt. 121-2 at 17-21); *Special Prosecutor Settles Federal Lawsuit with Bianchi*, July 24, 2012 (Dkt. 121-2 at 2-4); *$157K Settlement from One Defendant in Bianchi Conspiracy Case*, July 24, 2012 (Dkt. 121-2 at 11-14); *Our View: Settlement Says a Lot*, July 26, 2012 (Dkt. 121-2 at 8-10); *Lou Bianchi's Case Against Those Who Persecuted Him,* July 26, 2012 (Dkt. 121-2 at 22-34).

[7] Due to the length of the Complaint, the Blog states that it will post ten pages per day (Dkt. 121-2 at 22). Quest seems to misunderstand this as the Blog "vow[ing] to post additional information about the case every day for the next ten days" (Dkt. 121 at 4).

Bianchi has leaked or is leaking sensitive information to the press.[8]

This conclusion makes Quest's reliance on *Seipler v. Cundiff*, No. 08-C-50257, 2011 U.S. Dist. LEXIS 120079, at *1-11 (N.D. Ill. Oct. 18, 2011), unpersuasive. First, *Seipler* involved the web posting of 50 pages from employee disciplinary files, documents unquestionably covered by the protective order in that case. Second, the circumstantial evidence in *Seipler* suggested that the Plaintiff had himself posted the confidential documents.

Quest argues that designating the documents as confidential is necessary to "prevent further embarrassment and financial damage" to Quest (Dkt. 121 at 8). This case is going to receive extensive media attention; it already has. The Court finds that application of the Protective Order to Quest's *entire* May 23 production is not a proper way to address this concern. The ethical rules governing conduct by lawyers forbid any counsel from making a statement that he knows or should know would threaten the fairness of the court proceeding. Illinois Rule of Professional Conduct 3.6, which governs "Trial Publicity," states that, in cases attracting media attention, a lawyer may not make any extrajudicial statement that would "pose a serious and imminent threat to the fairness of an adjudicative proceeding in the matter." The Court is confident that all counsel involved in this case will be mindful

---

[8] Plaintiffs sent a Rule 11 safe harbor letter to Quest on August 3, 2012, objecting to Quest's accusations in this regard. In response, Quest denied that it was accusing Plaintiffs' counsel of any misconduct (Dkt. 148-1). The Court is unable to read Quest's brief in any way other than accusing Plaintiffs' counsel of leaking information to the press. Such accusations are serious and, when unfounded, are improper and a waste of the Court's resources.

of those ethical limitations as they interact with the media.[9]

## C.     The Protective Order as an Enforceable Contract

Finally, Quest argues that the Court should enforce its designation of documents as confidential because Plaintiffs agreed (pending entry of a protective order) to keep the material confidential and then agreed to the terms of the Protective Order itself (Dkt. 121 at 11). This argument lacks merit for several reasons.

First, Plaintiffs never agreed to keep the material confidential during the duration of the litigation. They agreed only to not disclose the information while the parties negotiated the terms of a protective order. On May 22, 2012, counsel for Plaintiffs wrote:

> I do not anticipate any problem with negotiating a protective order to cover sensitive documents.  I will agree not to disseminate any documents or information contained in the document to anyone, including my clients, until such time as an agreement is executed.

Then, on May 23, 2012, Quest delivered their production with a cover letter stating as follows:

> Please be advised that this production is being provided to you as a professional courtesy prior to the entry of a formal Protective Order in

---

[9] As an alternative remedy, Quests requests that the Court issue an order prohibiting Bianchi from divulging any information contained in the May 23rd production to third parties. Judicial restraints on extrajudicial comments of lawyers about a pending proceeding—commonly referred to as "gag orders"—must be evaluated in the context of First Amendment jurisprudence. *Chase v. Robson*, 435 F.2d 1059 (7th Cir. 1970) (sustaining challenge by counsel and defendants to an order restricting them from speaking to the press about the trial). Courts in this circuit require a showing of a "clear and present danger" or a "serious and imminent threat" to a fair a trial before restraining litigant speech. *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 249 (7th Circuit. 1975). For the same reasons that Quest fails to show good cause, it fails to meet the rigorous standard for a gag order.

> this case and in anticipation of same. We trust that you will keep
> these documents confidential pursuant to our agreement of May 22,
> 2012 until the parties are able to enter a formal protective order.

Those communications hardly represent an agreement by Plaintiffs to forever keep

the production confidential, as Quest now suggests.

Moreover, the Protective Order expressly provides a procedure for

challenging an opponent's designation of documents as protected (Dkt. 93 at 7). Far

from stripping Plaintiffs of their right to object to a confidentiality designation, the

Protective Order expressly reserves that right and provides a mechanism for its

exercise. Quest does not address this provision of the Protective Order, but

attempts to rely on *Paine v. City of Chicago,* No. 06 C 3173, 2006 WL 3065515, at

*18 (N.D. Ill. Oct. 26, 2006), for the proposition that a Protective Order is a binding

contract (Dkt. 121 at 10). The problem with Quest's argument is that the Protective

Order in *Paine* expressly defined "confidential matter" to include "files generated by

the investigation of complaints of misconduct by Chicago police officers." *Paine,*

*supra,* at *2. Here, to the contrary, "confidential" is defined as "sensitive, personal

and/or proprietary information that is treated as confidential" (Dkt. 93 at 2). As

discussed above, Quest has failed to establish that the emails, billing records or

non-IRB reports are, in their totality, "confidential" as defined in the Protective

Order.

Therefore, the Court rejects Quest's argument that the Protective Order, or

the interim confidentiality agreement that preceded it, are binding contracts that

prevent the Court from considering Plaintiffs' objections to the confidentiality

designations of the emails, the billing records, or the non-IRB reports.

## III.    Conclusion

For the foregoing reasons, the Court DENIES Quest's Motion to Enforce Designation of Documents as Confidential Under the Protective Order (Dkt. 99 and Dkt. 121) and TERMINATES AS MOOT Bianchi's Motion to Strike Quest's Amended Motion to Enforce (Dkt. 122).

ENTER:

_____

MARY M. ROWLAND
United States Magistrate Judge

Dated: November 28, 2012