**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LOUIS A. BIANCHI, JOYCE A. SYNEK, )
RONALD J. SALGADO, and MICHAEL )
J. McCLEARY, )
                               )
               Plaintiffs, )
                               )
              v. )        CASE NO. 12-cv-00364
                               )
THOMAS K. McQUEEN, DANIEL )        Judge Robert M. Dow, Jr.
JERGER, ROBERT SCIGALSKI, JAMES )
REILLY, PATRICK HANRETTY, )
RICHARD STILLING, QUEST )
CONSULTANTS INTERNATIONAL, )
LIMITED, an Illinois Corporation, and )
UNKNOWN CO-CONSPIRATORS, )
                               )
              Defendants. )

## MEMORANDUM OPINION AND ORDER

Defendants investigated and prosecuted Plaintiffs for allegedly abusing their positions at the State's Attorney's Office in McHenry County, Illinois. Once Plaintiffs defeated the charges against them — through voluntary dismissal and acquittal at trial — they sued special prosecutors Thomas K. McQueen and Henry C. Tonigan and certain Quest employees hired to assist them with the investigation and prosecution. According to Plaintiffs' fifteen-count amended complaint, Defendants' investigation and prosecution violated Plaintiffs' rights under federal and state law. Defendants have moved to dismiss based on absolute and qualified immunity.

For the reasons stated below, Defendants' motions to dismiss [73, 80] are granted. Plaintiffs' federal claims (Counts I – VII) are dismissed with leave to replead within 28 days if Plaintiffs believe that an amended complaint could overcome the immunity obstacles set forth below. If Plaintiffs decide not to replead, Plaintiffs' federal claims will be dismissed with prejudice and the Court will decline to exercise supplemental jurisdiction over Plaintiffs' state law claims (Counts VIII – XV) and dismiss those claims without prejudice.

## I.    Background

The facts are drawn from Plaintiffs' amended complaint [70]. In deciding Defendants' motion to dismiss, the Court accepts well-pleaded facts as true and draws all reasonable inferences in Plaintiffs' favor. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

Bianchi is the State's Attorney in McHenry County, Illinois. He first was elected in 2004. He ran again in 2008, and he was reelected following what he describes as "highly contentious" Republican primary. According to the complaint, the campaign to unseat him continued after the election:

> After failing in their efforts to legally remove Bianchi from office during the 2008 election, Bianchi's political opponents initiated a politically motivated conspiracy to override the election and force Bianchi from office. The objective of this conspiracy was to arrest, indict, and publically smear Bianchi, thereby causing him to resign his office, irreparably tarnish his public reputation, and allow his political opponents to install a State's Attorney who would do their bidding.

Compl. ¶ 16. As it bears on this case, the alleged conspiracy to unseat Bianchi took the form of an investigation and prosecution by special prosecutor Tonigan (no longer a Defendant) and his assistant special prosecutor, Defendant McQueen.

As Plaintiffs tell it, the story of this case begins in 2004, when Amy Dalby was a secretary in the State's Attorney's Office ("SAO"). Prior to resigning in 2006, Dalby "stole

approximately 5000 documents from an SAO computer, including confidential and sensitive documents concerning pending investigations and prosecutions." Compl. ¶ 18. In 2007, Dalby gave the stolen documents to Kristen Foley, apparently an ally of Bianchi's primary opponent, Daniel Regna, to use in his campaign. Foley gave the documents to Regna and the media. Compl. ¶ 19-20. Bianchi petitioned a court to appoint a special prosecutor independent of the SAO to investigate and if necessary prosecute responsible parties. Compl. ¶ 21. Ultimately, Dalby was arrested and charged with six felonies. In June 2009, she pled guilty to computer tampering. Compl. ¶ 22.

In April 2009, Dalby filed a petition for the appointment of a special prosecutor "to investigate her allegation that she performed political work while working in the SAO from December of 2004 until July of 2006." Compl. ¶ 24. In September 2009, McHenry County Circuit Court Judge Gordon Graham granted Dalby's petition and appointed Tonigan and McQueen as special state's attorneys to investigate and if necessary prosecute. See Compl. ¶¶ 5, 27, 86.

In November 2009, after Tonigan's and McQueen's initial interviews with Dalby and others, Tonigan wrote to Judge Graham asking to "expand the order defining the role of our investigation." Compl. ¶ 35. According to Plaintiffs, Tonigan's letter "contained * * * blatantly false statements." Compl. ¶ 36. The letter prompted Judge Graham to issue an order granting Tonigan and McQueen "the authority to investigate and prosecute Bianchi and 'any and all persons' relative to any misappropriation or theft from '2005 and thereafter.'" Compl. ¶ 37 (quoting Judge Graham's order).

"Around December or 2009," Tonigan retained Defendant Quest to investigate Bianchi. Compl. ¶ 38. Quest employees Daniel Jerger, Robert Scigalski, James Reilly, Patrick Hanretty,

and Richard Stilling (collectively, "Quest Defendants," also referred to in Plaintiffs' complaint as "Quest Investigators" or "Quest investigators") were appointed as special investigators and participated in Tonigan's and McQueen's investigation of Bianchi and the SAO. After conducting interviews, the Quest Defendants "informed Tonigan and/or McQueen of information related during the interviews." Compl. ¶ 44. After consulting with "Tonigan and/or McQueen" the Quest Defendants prepared reports summarizing their findings. According to the complaint, at Tonigan's "and/or" McQueen's behest, the reports "included false and manufactured information" about the statements of various current and former assistant state's attorneys. Compl. ¶ 45 a-d (detailing alleged false statements in Defendants' reports). Plaintiffs assert that "[a]ll of the former and current ASAs described in paragraph 45 (a-d) have confirmed that they did not make any of the statements attributed to them." Compl. ¶ 46.

In April 2010, Judge Graham convened a grand jury and appointed the Quest Defendants as agents of the grand jury. Compl. ¶ 47. Plaintiffs allege that the Quest Defendants did not follow Illinois law in serving search warrants, subpoenas, and subpoenas duces tecum. Compl. ¶ 49. Based on those subpoenas, numerous witnesses produced documents to Tonigan and McQueen and testified before the grand jury. Compl. ¶ 50. Plaintiffs allege that Defendants McQueen, Scigalski, and Jerger made false statements to the grand jury. In September 2010, the grand jury returned indictments against Bianchi for conspiracy to commit official misconduct and obstruction of justice, nineteen counts of official misconduct, and unlawful communication with a witness and against Synek for conspiracy to commit official misconduct and obstruction of justice, four counts of perjury, and obstruction of justice. Compl. ¶¶ 57-58. An arrest warrant was issued and Bianchi and Synek were arrested. Compl. ¶ 64.

Shortly after obtaining the first indictment, McQueen filed a petition to expand the investigation of Bianchi and SAO employees. Compl. ¶ 83. In October 2010, Judge Graham "signed an order appointing Defendants McQueen and Tonigan as special state's attorneys to investigate and prosecute individuals for using their official position in the SAO to give benefits in criminal prosecutions to friends, relatives, and supporters." Compl. ¶ 86. Defendants again served subpoenas and, again, witnesses appeared and testified before the grand jury. Compl. ¶ 96.

In February 2011, the grand jury retuned indictments against Bianchi for three counts of official misconduct for improperly intervening in criminal cases on behalf of friends and political supporters, against Salgado for official misconduct for intervening in a criminal case on behalf of his nephew, and against McCleary for official misconduct related to improper use of a county vehicle. Compl. ¶¶ 99, 100, 110. As a result of the indictments, warrants were issued, and Bianchi, Salgado, and McCleary were arrested. Compl. ¶¶ 102, 103, 111.

Shortly after the return of the second indictment, Tonigan, McQueen, and Scigalski held a press conference where McQueen repeated the allegations contained in the indictments against Bianchi, Salgado, and McCleary. According to the complaint, McQueen also said things about Plaintiffs that went beyond the indictments, such as that "after the return of the first indictment Scigalski received calls from a number of lawyers regarding cases handled by Bianchi and that those cases suggested that the equal protection rights of all defendants were not being upheld because of favoritism." Compl. ¶ 113.

After the McHenry County Circuit Court judges recued themselves, the Illinois Supreme Court appointed Judge Joseph McGraw from the Seventeenth Judicial Circuit to preside over the cases against Plaintiffs. Compl. ¶ 77. In March 2011, after a two day bench trial, Judge

McGraw granted Bianchi's and Synek's Motion for a Directed Finding and acquitted them of all charges in the first indictment. On June 3, 2011, Judge McGraw dismissed the charges of official misconduct against Salgado "based on the failure of the charge to state an offense" against him. Compl. ¶ 120. On June 29, 2011, the charge of official misconduct was dismissed against McCleary "based on the failure of the charge to state an offense" against him. Compl. ¶ 121. In August 2011, after a second bench trial, Judge McGraw granted Bianchi's motion for a directed finding and acquitted Bianchi of the remaining charges. Compl. ¶ 123.

Following the dismissals, Plaintiffs filed this suit against Tonigan, McQueen, the Quest Defendants, Quest Consultants International, Ltd., Tonigan's law firm, and unknown co-conspirators. Tonigan and his law firm are now out of the case. Against the remaining Defendants, Plaintiffs assert fifteen claims under federal and state law. Defendants have moved to dismiss.

## II.     Motion to Dismiss Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III.   Analysis

### A.   Federal Claims

Plaintiffs assert seven claims under 42 U.S.C. § 1983 for alleged violations of their federal constitutional rights by state officials acting under color of state law. Counts I - III are for false arrest. Counts IV - V allege that Defendants conspired to violate Plaintiffs' due process rights by fabricating evidence and failing to disclose exculpatory evidence. Counts VI - VII assert that Defendants conspired to charge and prosecute Plaintiffs as retaliation for Bianchi's decision to "seek and hold" public office. Defendants claim absolute and qualified immunity.

Section 1983 creates a private right of action to vindicate violations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. See *Rehgburg v.*

*Paulk*, 132 S. Ct. 1497, 1502 (2012). By its terms, it applies to "[e]very person" who acts under color of state law to violate those rights. See *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976). "Despite the broad terms of § 1983, [the Supreme Court has] long recognized that the statute was not meant to effect a radical departure from ordinary tort law and the common-law immunities applicable in tort suits." *Rehberg*, 132 S. Ct. at 1502 (citing cases).

In deciding what immunities apply in § 1983 cases, the Supreme Court has "consulted the common law to identify those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed 'with independence and without fear of consequences.'" *Rehberg*, 132 S. Ct. at 1502 (quoting *Bradley v. Fisher*, 13 Wall. 335, 350 n.59 (1872)). Relevant to this case, the Supreme Court has held that witnesses before a grand jury, witnesses at trial, and prosecutors acting in furtherance of their prosecutorial duties are entitled to absolute immunity. *Id.* at 1503, 1506. Those acting under color of state law in an investigatory role, including prosecutors, may claim only qualified immunity. See *Buckley v. Fitzsimmons*, 509 U.S. 259, 270 (1993).

Whether a prosecutor is acting within the scope of his prosecutorial duties, and is therefore entitled to absolute immunity, "hinges on whether the prosecutor is, at the time, acting as an officer of the court, as well as on his action's relatedness to the judicial phase of the criminal process." *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012). Prosecutorial immunity "extends beyond an individual prosecutor's decision to indict or try a case." *Id.* (citing *Van de Kamp v. Goldstein*, 555 U.S. 335, 344-48 (2009). It protects the "functioning of the public office" and so "encompasses any action directly relevant to a prosecutor's ability to conduct a trial." *Id.* But when a prosecutor is functioning like a detective, "searching for the clues and

corroboration that might give him probable cause to recommend that a suspect be arrested," then the prosecutor is acting as a detective and is not entitled to greater immunity.  See *Buckley*, 509 U.S. at 273, 276.  "In other words, '[w]hen the functions of prosecutors and detectives are the same * * * the immunity that protects them is also the same.'"  *Lewis v. Mills*, 677 F.3d 324, 330 (7th Cir. 2012) (quoting *Buckley*, 509 U.S. at 276).

Qualified immunity "protects government officials from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Viilo v. Eyre*, 547 F.3d 707, 709 (7th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is immunity from suit rather than merely a defense to liability.  *Scott v. Harris*, 550 U.S. 372, 376 n. 2 (2007).  The qualified immunity analysis comprises a two-part inquiry:  (i) "whether the facts alleged show that the state actor violated a constitutional right," and (ii) "whether the right was clearly established."  *Hanes v. Zurich*, 578 F.3d 491, 493 (7th Cir. 2009).

### 1.    Thomas K. McQueen

Plaintiffs first argue that McQueen is not entitled to absolute immunity because he was not actually a special prosecutor.  This line of argument is something of a surprise because Plaintiffs' complaint repeatedly describes McQueen as a special state's attorney or as someone vested with the same legal authority as a state's attorney.  For instance, the complaint begins this way:

> This action is brought pursuant to the First, Fourth and Fourteenth Amendments to the United States Constitution and under Illinois state Law.  Plaintiff Louis A. Bianchi, the State's Attorney of McHenry County (hereinafter "Bianchi"), and three of his employees were the victims of politically and financially motivated criminal investigations and prosecutions orchestrated by Defendants Henry C. Tonigan, III and Thomas K. McQueen, in their roles as taxpayer funded special

state's attorneys in McHenry County, in concert with their co-Defendant private investigators, acting as special state's attorney investigators.

A few paragraphs later, the complaint explains that

At all relevant times [Tonigan and McQueen] were attorneys, appointed as a taxpayer funded McHenry County special state's attorney and an assistant to the special state's attorney, respectively, and were acting under the color of law and with the same power and authority as a duly elected state's attorney with respect to matters committed to their discretion.

Compl. ¶ 5. See also Compl. ¶ 86 ("Judge Gordon Graham signed an order appointing Defendants McQueen and Tonigan as special state's attorneys to investigate and prosecute individuals for using their official position in the SAO to give benefits in criminal prosecutions to friends, relatives, and supporters"). At this stage, the Court is focused on Plaintiffs' complaint. As the quoted passages indicate, apart from their response to Defendants' motion to dismiss, Plaintiffs consistently have alleged that McQueen misused his appointment and authority as a special prosecutor to violate their constitutional rights. In deciding Defendants' motion to dismiss, the Court must hold Plaintiffs to those assertions. See, *e.g., Odom v. Sheriff and Staff*, 2007 WL 1238723, at *2 (C.D. Ill. Apr. 26, 2007) (it is "well established that a plaintiff cannot amend his complaint by statements made in briefs filed in opposition to a motion to dismiss") (citing *Perkins v. Silverstein*, 939 F.2d 463, 471 n.6 (7th Cir. 1991)); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). Although in certain circumstances the Court may consider additional facts consistent with a complaint in deciding a motion to dismiss, it cannot consider facts that contradict the complaint — as any claim that McQueen was not a special prosecutor surely would. See, e.g., *Flying J, Inc. v. City of New Haven*, 549 F.3d 538, 542 n. 1 (7th Cir. 2008); *Help At Home, Inc. v. Medical Capital, LLC*, 260 F.3d 748, 752-53 (7th Cir. 2001) (courts may consider facts in a brief opposing a motion to dismiss "if the facts are

consistent with the allegations of the complaint"); *UNA Worldwide, LLC v. Orsello*, 2012 WL 6115661, at *3 (N.D. Ill. Dec. 10, 2012).

That said, McQueen is not entitled to absolute immunity just because he was employed as a prosecutor at the times relevant to this case. What matters for absolute immunity is whether the conduct that Plaintiffs allege violated their rights was within the scope of McQueen's prosecutorial duties. Plaintiffs believe that McQueen (individually and in concert with others) violated their federal rights in three ways: (1) by causing their false arrest (Counts I, II, and III), (2) violating their due process rights (Counts IV and V), and (3) prosecuting them in retaliation for Bianchi's decision to run for and remain in office (Counts VI and VII). Since the conduct supporting each claim is somewhat different, the Court considers each theory separately.

*False Arrest.* Plaintiffs were arrested after they were indicted by a grand jury and warrants were issued based on the indictments. McQueen cannot be liable for false arrest if Plaintiffs were arrested because of witness testimony or his presentation of witness testimony before the grand jury. A prosecutor's conduct before a grand jury is absolutely immune. The Supreme Court explained this settled law in *Burns v. Reed*, 500 U.S. 478 (1991), a § 1983 case involving a prosecutor's claim of absolute immunity for his conduct at a probable cause hearing:

> Like witnesses, prosecutors and other lawyers were absolutely immune from damages liability at common law for making false or defamatory statements in judicial proceedings (at least so long as the statements were related to the proceeding), and also for eliciting false and defamatory testimony from witnesses. See, *e.g.*, *Yaselli v. Goff*, 12 F.2d 396, 401-02 (2d Cir. 1926), summarily aff'd, 275 U.S. 503 (1927) [additional citations omitted]. See also *King v. Skinner*, Lofft 55, 56, 98 Eng. Rep. 529, 530 (K.B. 1772), where Lord Mansfield observed that "neither party, witness, counsel, jury, or Judge can be put to answer civilly or criminally, for words spoken in office."

> This immunity extended to "any hearing before a tribunal which perform[ed] a judicial function." W. Prosser, Law of Torts, § 94, pp. 826-27 (1941) [additional citations omitted]. In *Yaselli v. Goff*, 275 U.S. 503 (1927), for example, this Court affirmed a decision by the Circuit Court of Appeals for the Second Circuit

in which the court had held that the common-law immunity extended to a prosecutor's conduct before a grand jury. [Additional citations omitted.]

\* \* \*

As this and other cases indicate, pretrial court appearances by the prosecutor in support of taking criminal action against a suspect present a substantial likelihood of vexatious litigation that might have an untoward effect on the independence of the prosecutor.

*Id.* at 489-92. Of course, if a prosecutor manufactured incriminating evidence while investigating a case, presented that manufactured evidence to the grand jury, and the grand jury returned an indictment, he could not claim absolute immunity for what he did during the investigation. A judicial proceeding does not automatically immunize misconduct that happened before it. See *Buckley*, 509 U.S. at 276 ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial."); *Whitlock v. Bruggemann*, 682 F.3d 567, 578 (7th Cir. 2012); *Fields*, 672 F.3d at 514. But, by the same token, just because a prosecutor was involved in a case in an investigatory role does not mean that he is deprived of immunity for what he did as a prosecutor. "[T]he question of immunity turns on the capacity or function that the prosecutor was performing *at the time of the alleged wrongful conduct*." *Whitlock*, 682 F.3d at 579 (emphasis added).

In this case, at least for Plaintiffs' false arrest claims, the only allegations against McQueen are that he interviewed witnesses and reviewed Quest Defendants' reports of interviews with witnesses and that those witnesses and Quest Defendants testified and produced

documents to the grand jury.[1]  McQueen, too, is alleged to have testified before the grand jury. The claim is therefore that (1) witnesses gave false or misleading testimony to the grand jury that included rumor, hearsay, and manufactured and/or fabricated evidence, (2) *that testimony* persuaded the grand jury to issue an indictment, and (3) that indictment caused an arrest. Plaintiffs' false arrest claim against McQueen thus is an attack on grand jury testimony and a prosecutor's conduct before a grand jury (as a witness and a lawyer).  This is not a case where a prosecutor is claiming immunity for investigatory conduct just because it was part of a series of events that led to a judicial proceeding.  Here, it is plainly conduct at a judicial proceeding — grand jury testimony — that Plaintiffs claim caused their injuries related to the allegedly false arrest.

In order to find that the indictment, and so the arrest, was improper, the Court would have to scrutinize grand jury transcripts and decide whether witnesses (including McQueen) perjured themselves before the grand jury.  That, however, is precisely what the Court cannot do in deciding a claim for money damages against a prosecutor.  Especially following the Supreme Court's recent decision in *Rehberg*, the Court is not persuaded by Plaintiffs' argument that they are seeking damages for a conspiracy to present false testimony or a conspiracy to prepare witnesses to give false testimony.  The rule that witnesses before a grand jury enjoy absolute immunity

> may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, "a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves" *Buckley*, 509 U.S. at 283 (Kennedy, J. concurring in part and dissenting in part) [additional citations omitted].  In the vast majority of cases

---

[1] Although Plaintiffs assert that "Defendants Tonigan and McQueen" sought to expand their investigative authority (Cmplt. ¶ 33), the factual support for that allegation is a letter to Judge Graham sent by Tonigan on the letterhead of his law firm (*id.* ¶¶ 34-36).

involving a claim against a grand jury witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony. We decline to endorse a rule of absolute immunity so easily frustrated.

132 S. Ct. at 1506-07. That does not immunize all preparation or turn all investigation into preparation. But that is not what is going on here. Here, the relevant allegations are that evidence was presented to a grand jury and that the evidence was reviewed before it was presented. Plaintiffs cannot "reframe" their challenge to (allegedly) false or repudiated grand jury testimony by pointing to alleged misconduct at the outset of the investigation. It was not the mere existence of an investigation that caused Plaintiffs' arrest; testimony before the grand jury did that.

Plaintiffs have not stated a plausible claim that improper actions by McQueen outside the scope of his duties as a prosecutor infected the grand jury proceedings and so somehow caused Plaintiffs' arrests. One more time, recall the alleged causal chain. Amy Dalby, an SAO employee, shared confidential documents with Bianchi's Republican primary opponent and the media. Bianchi got a special prosecutor appointed. Dalby was investigated and eventually pled guilty to computer tampering. Dalby then petitioned Judge Graham to appoint a special prosecutor to investigate Bianchi, alleging that he abused his position at the SAO. Judge Graham granted Dalby's petition and appointed Tonigan and McQueen as special prosecutors. Tonigan and McQueen interviewed Dalby and others and asked for Judge Graham to expand the scope of their investigation. Judge Graham granted that request, and there were more interviews and documents produced. A grand jury convened and witnesses (including McQueen) appeared before it. The grand jury indicted Plaintiffs, and the indictments led to their arrests. Where is McQueen's misconduct outside his role as a prosecutor (or before the grand jury)? Plaintiffs point to the Tonigan letter (referenced above) through which they allege that Tonigan and

McQueen manipulated Judge Graham to have their mandate expanded. But that did not cause Plaintiffs' arrests. At most, that led to interviews, and those interviews did not violate the Fourth Amendment. Plaintiffs (quite properly) are not claiming a right not to be investigated or talked about. Individuals were interviewed and then testified before the grand jury. In the context of this case at least, interviewing a witness before his or her testimony before a grand jury is conduct within the scope of McQueen's role as a prosecutor and so is absolutely immune. See *Rehberg*, 132 S. Ct. at 1506-07. Testimony before the grand jury is absolutely immune. *Id.* And, as has long been the rule, a prosecutor's conduct before a grand jury is absolutely immune. *Burns*, 500 U.S. at 489-92.

Finally, even if McQueen were not entitled to absolute immunity, he would be entitled to qualified immunity, because there was no violation of Plaintiffs' rights against false arrest. False arrest is detention *without* legal process. See *Wallace v. Kato*, 549 U.S. 384, 389 (2007); *Abu-Shawish v. United States*, 2011 WL 3687618, at *6 (E.D. Wis. Aug. 22, 2011) ("false arrest and false imprisonment occur only when a person is detained without legal process"). In this case, Plaintiffs' arrests were supported by grand jury indictments and warrants. By definition, therefore, no false arrest could have occurred. See *Abu-Shawish*, 2011 WL 3687618, at *6. The unlawful procurement of process could be a different tort — malicious prosecution, perhaps — but it is not false arrest. See *id.* at *6 n. 2.

*Due Process*. McQueen is alleged to have violated Plaintiffs' due process rights by "causing [Plaintiffs'] wrongful charging and continued prosecution." In opposing McQueen's motion to dismiss, Plaintiffs explain their claim against McQueen as "based on the fact that McQueen deliberately fabricated false evidence and withheld exculpatory evidence which directly caused the wrongful charging and prosecution of Plaintiffs and denied their rights to a

fair trial." To the extent that this claim attacks the grand jury indictments and subsequent arrests, Plaintiffs' due process claims fail for the same reasons as their Fourth Amendment claims. See also *Imbler*, 424 U.S. at 422. To the extent that these claims challenge the prosecution itself, McQueen is absolutely immune. *Id.* at 427; *Fields*, 672 F.3d at 512. Plaintiffs' attempt to avoid the obvious immunity problems with their due process claims against McQueen by arguing that their case is just like *Whitlock*, where evidence was fabricated prior to the prosecutor's assumption of his prosecutorial role. 682 F.3d at 579-80. In this case, unlike *Whitlock*, Plaintiffs' due process claims concern alleged misconduct before the grand jury and the events that followed. The complaint recites a variety of allegedly untrue statements that McQueen (and other witnesses) made to the grand jury. For instance:

> Defendant McQueen improperly testified as a witness to the following and unsworn false statements of fact:
>
> > i)    that County employees were given "comp time" for attending parades and evening public events which were political in nature;
> >
> > ii)   that Thomas Carroll, a former ASA, was directly told that he was expected to participate in political activities when he was hired as chief of the civil division;
> >
> > iii)  that political pressure was brought to bear on SAO employees during Bianchi's tenure;
> >
> > iv)   that all of the documents McQueen presented to the special grand jury, which came from the hard drive of a computer used by Joyce Synek, were political in nature; and
> >
> > v)    that Joan Hoffman, an administrative assistant in the SAO, provided McQueen political documents from her SAO computer.

Compl. ¶ 51. That is an attack on a prosecutor's (or a witness') conduct before the grand jury. Even if the complaint does accurately recount what McQueen said, and even if what he said was false, he is not answerable in damages for his conduct before the grand jury.

The Supreme Court has admonished that prosecutorial immunity has a downside – namely, that it can "leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Imbler*, 424 U.S. at 427-28. This Court offers no opinion on whether Plaintiffs were "genuinely wronged"; for the purposes of the immunity questions presented at this stage of the case, that inquiry is irrelevant. What matters is that Plaintiffs' claims are against a prosecutor for prosecuting a case.

If these claims were not barred by prosecutorial immunity, they still would be subject to dismissal because McQueen would be entitled to qualified immunity. If Plaintiffs' due process claims are that McQueen's fabrication of evidence caused their arrests, then Plaintiffs fail to state a claim, for it would be "nothing more than a recast of [their] Fourth Amendment false arrest claim." *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003). "The Supreme Court has made it clear that a substantive due process claim may not be maintained when a specific constitutional provision (here the Fourth Amendment) protects the right allegedly violated." *Id.* "Moreover, to the extent [Plaintiffs] maintain[] that [McQueen] denied [them] due process by causing [them] to suffer '[a] deprivation of liberty from a prosecution * * * deliberately obtained from the use of false evidence,' [their] claim is essentially one for malicious prosecution." *Id.* And "the existence of a tort claim under state law knocks out any constitutional theory of

malicious prosecution." *Id.* (quoting *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001)). To the extent that the claim is based on nondisclosure of exculpatory evidence — a *Brady*-related claim — then, because the prosecutions ended in acquittals, Plaintiffs "would need to show that 'the decision to go to trial would have been altered by the desired disclosure.'" *Mosely v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010) (quoting *Bielanski v. County of Kane*, 550 F.3d 632, 644 (7th Cir. 2008)). In this case, however, the prosecutors were not "bilked" into bringing charges. See *Buckley IV*, 20 F.3d at 797; *Fields*, 672 F.3d at 518. McQueen was a prosecutor and he was not tricked by his own alleged deceptions and failures to disclose. And Plaintiffs' complaint does not support a claim that McQueen "bilked" Tonigan. As already explained, Plaintiffs' complaint alleges that McQueen and Tonigan were both vested with authority as prosecutors and that they both reviewed witness interviews and prosecuted the cases.[2]

*Retaliatory Prosecution.* Plaintiffs allege that McQueen, "individually, jointly and in conspiracy with [the other Defendants] caused the wrongful charging and continued prosecution" of Plaintiffs. But "[a] *Bivens* (or § 1983) action for retaliatory prosecution will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute." *Hartman v. Moore*, 547 U.S. 250, 261-62 (2006). Moreover, it is worth noting that the complaint does not allege that McQueen had retaliatory animus against Bianchi. It certainly alleges that Bianchi's Republican opponents wanted to unseat him, but it does not say why McQueen — appointed by Judge Graham — should be counted among those political opponents. In fact, the complaint is devoid of any allegation that either Tonigan or McQueen (or any other

---

[2] For example, according to the complaint, the Quest Defendants "informed Tonigan and/or McQueen of information related during [witness] interviews." Compl. ¶ 44. And, after consulting with "Tonigan and/or McQueen" the Quest Defendants prepared reports summarizing their findings. Again, according to the complaint, at Tonigan's "and/or" McQueen's behest, the reports "included false and manufactured information" about the statements of various current and former assistant state's attorneys. Compl. ¶ 45.

Defendant) even knew any of the Plaintiffs prior to their appointment by Judge Graham, much less had any political axe to grind or other animus toward them. According to the complaint, Bianchi's "political enemies" were Dalby, Kristen Foley, an Assistant State's Attorney whom Bianchi had demoted, and Daniel Regna, Bianchi's 2008 opponent in the primary election for State's Attorney (Cmplt. ¶¶ 1, 17-24) – none of whom is a Defendant in this case. Accepting Bianchi's characterization that he had "political enemies," it does not follow that the Court must assume that every action against him is improperly motivated.

### 2. Quest Defendants

Judge Graham authorized Tonigan and McQueen to employ the Quest Defendants as "special state's attorney investigators." Compl. at page 2. According to Plaintiffs' complaint, the Quest Defendants were directed by McQueen "and/or" Tonigan "to conduct certain interviews for the purpose of manufacturing and fabricating evidence." Compl. ¶ 42. "After conducting interviews, the Defendant Quest Investigators informed Tonigan and/or McQueen of information related during the interviews." Compl. ¶ 44; see also compl. ¶ 90 ("The interviews conducted by Defendants Scigalski and Hanretty occurred at the direction of Defendants Tonigan and/or McQueen. After they were completed, the Defendant Quest Investigators informed Defendants Tonigan and/or McQueen of the substance of several interviews."). "After consulting with Defendants Tonigan and/or McQueen, the Defendant Quest Investigators prepared reports regarding certain interviews." Compl. ¶ 45. In furtherance of the alleged conspiracy with McQueen and Tonigan against Plaintiffs, the Quest Defendants are accused of knowingly including falsehoods in their reports.

"After the special grand jury was convened, Defendants Tonigan and/or McQueen continued to lead the politically motivated investigation by interviewing witnesses personally and directing the Quest investigators who to interview, what questions to ask, and what information to document." Compl. ¶ 48. "The Defendant Quest Investigators served search warrants, subpoenas, and subpoenas duces tecum at the direction of Defendants Tonigan and McQueen." Compl. ¶ 49. Those subpoenas were allegedly "unilaterally issued" by Tonigan and McQueen, in violation of Illinois law. Witnesses then produced documents and appeared before the grand jury. Compl. ¶¶ 49-50. The Quest Defendants were among the witnesses who allegedly testified falsely against Plaintiffs. See, *e.g.*, Compl. ¶¶ 53-56, 73; see also Compl. ¶¶ 95-97 (alleged misconduct before grand jury at the direction of Tonigan and McQueen). In this way, and as described in Section I, above, the Quest Defendants were instrumental in Plaintiffs' investigation and prosecution.

The Quest Defendants argue that they are entitled to qualified immunity for their conduct as private investigators temporarily employed by the state, see *Filarsky v. Delia*, 132 S. Ct. 1657, 1665-68 (2012) (private party temporarily employed by government entitled to seek qualified immunity for conduct as investigator), and absolute immunity for their grand jury testimony, see, *e.g.*, *Rehberg*, 132 S. Ct. at 1506. The Court agrees. With regard to investigatory conduct, the Quest Defendants could not have committed a constitutional tort by simply interviewing witnesses and preparing reports. See, *e.g.*, *Buckley*, 509 U.S. at 281 (Scalia, J., concurring) (Justice Scalia was "aware of no authority for the proposition that the mere preparation of false evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution"). An investigator could commit a constitutional tort by fabricating evidence and tricking a prosecutor into bringing charges. Here, however, there was

no trick.  According to the complaint, McQueen and Tonigan guided the Quest Defendants' actions and were told what the Quest Defendants learned in their interviews.  The alleged constitutional tort, then, is not the investigators' conduct, but the prosecutors' one-sided presentation of the evidence, including false testimony before the grand jury.  McQueen, the remaining prosecutor-Defendant, is entitled to absolute immunity for his presentation of evidence to the grand jury and at trial.  The Quest Defendants did not commit a constitutional tort by giving the prosecutors information that they (allegedly) chose to distort.  See *Fields*, 672 F.3d at 516-17.  Insofar as Plaintiffs' claims depend on the Quest Defendants' allegedly false grand jury testimony, they are entitled to absolute immunity. See, *e.g.*, *Rehberg*, 132 S. Ct. at 1506.

\* \* \*

Based on the foregoing discussion, all of Plaintiffs' claims, at least as currently cast, are subject to dismissal.  Although Plaintiffs' operative first amended complaint [70] runs forty-nine pages in length and Defendants' immunity defenses may be difficult to overcome, the Court will not enter a dismissal with prejudice at this time.  Plaintiffs who meet resistance to their complaint through a successful Rule 12(b)(6) motion generally are allowed at least one opportunity to replead, and that is an especially prudent course to follow where, as here (see pp. 9-10, *supra*), there is some tension between the version of the facts alleged in the complaint itself and another version of the facts set out in the brief in opposition to the motion to dismiss.  See, *e.g.*, *Smith v. Union Pac. R. Co.*, 474 Fed. Appx. 478, 481 (7th Cir. Apr. 5, 2012) ("Facts raised for the first time in plaintiff's opposition papers should be considered when determining whether to grant leave to amend or dismiss the complaint with or without prejudice") (citing *Broam v.*

*Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003)).  Plaintiffs therefore are given 28 days to replead if they believe that an amended complaint could overcome the immunity obstacles set forth above or otherwise state a claim for relief.  The discussion below addresses the disposition of Plaintiffs' state law claims in the event that (1) Plaintiffs do not replead or (2) no federal claim in Plaintiffs' second amended complaint survives a renewed motion to dismiss.

### B.       State Law Claims

Plaintiffs have not stated a federal claim, and the Court must now decide whether to retain jurisdiction over Plaintiff's state law claims.  See 28 U.S.C. § 1367(c)(3).  The Seventh Circuit, animated by the principle of comity, consistently has stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."  *Groce v. Eli Lilly,* 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget Constr. Co.,* 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir. 1993); see also *Wright v. Associated Ins. Co.,* Inc., 29 F.3d 1244, 1251 (7th Cir. 1994) ("When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction * * * "); see also *Horton v. Schultz,* 2010 WL 1541265, at *4 (N.D. Ill. 2010).

In *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251–53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine judicial economy, convenience, fairness, and comity-will point to a federal decision of the state-law claims on the merits."  The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim,

precluding the filing of a separate suit in state court." *Id.* at 1251. That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to re-file those claims in state court. See 735 ILCS 5/13–217; *Davis v. Cook County,* 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice of the state law claims also is appropriate here because the case is only at the motion to dismiss stage and substantial judicial resources have not been committed to the eight state law counts in Plaintiffs' complaint. *Wright,* 29 F.3d at 1251. Finding no justification for departing from that "usual practice" in this case, the Court dismisses without prejudice Plaintiff's state law claims without discussing their merit under state law.

## IV.    Conclusion

For the reasons stated above, Defendants' motions to dismiss [73, 80] are granted. Plaintiffs' federal claims (Counts I – VII) are dismissed with leave to replead within 28 days.  If Plaintiffs decide not to replead, Plaintiffs' federal claims will be dismissed with prejudice and the Court will decline to exercise supplemental jurisdiction over Plaintiffs' state law claims (Counts VIII – XV) and dismiss those claims without prejudice.[3]

Dated:  January 11, 2013                          _____

                                                                        Robert M. Dow, Jr.
                                                                        United States District Judge

---

[3] Defendants' motions to dismiss [41, 47] the original complaint [1] are stricken as moot.  Former Defendants Henry C. Tonigan, III, and Kelleher & Buckley, LLC's motions to dismiss [43, 85] are also stricken as moot.  Plaintiffs' Motion to Strike [a] Portion of Thomas' McQueen's Reply Brief or in the Alternative for Leave to File a Sur-Reply [125] is granted in part and denied in part.  The motion to strike is denied, the motion to for leave to file a sur-reply is granted and the attached sur-reply [125-1] was considered in deciding Defendants' motions.