# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LOUIS A. BIANCHI, JOYCE A. SYNEK, RONALD J. SALGADO, and MICHAEL J. McCLEARY, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Case No. 12-cv-00364 |
| | ) | |
| THOMAS K. McQUEEN, DANIEL JERGER, ROBERT SCIGALSKI, JAMES REILLY, PATRICK HANRETTY, RICHARD STILLING, QUEST CONSULTANTS INTERNATIONAL, LIMITED, an Illinois Corporation, and UNKNOWN CO-CONSPIRATORS, | ) ) ) ) ) ) ) ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are motions to dismiss [210, 215] Plaintiffs' second amended complaint [198], filed by Defendants Quest Consultants International, Limited ("Quest Consultants"), Daniel Jerger ("Jerger"), Robert Scigalski ("Scigalski"), James Reilly ("Reilly"), Patrick Hanretty ("Hanretty"), and Richard Stilling ("Stilling") (collectively, "Quest Defendants") [210], and Thomas McQueen ("McQueen") [215], respectively. Plaintiffs filed their second amended complaint [198] after the Court dismissed Plaintiffs' first amended complaint [70] for failure to state a claim, without prejudice to repleading if Plaintiffs believed that they could overcome the immunity obstacles laid out in the Court's January 11, 2013 Opinion and Order [195].

In their second amended complaint, Plaintiffs essentially have altered the allegations contained in their first complaint – in some places adding facts, in other places changing or deleting them, and in many instances contradicting their first complaint entirely – in an attempt to cure the deficiencies identified by the Court in its Opinion. The Court may consider only the second amended complaint. *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 782-83 (7th Cir. 2013) (citing *Moriarty v. Larry G. Lewis Funeral Dirs., Ltd.*, 150 F.3d 773, 777 (7th Cir. 1998)) ("[W]here an original complaint and an amended complaint contain contradictory or mutually exclusive claims, only the claims in the amended complaint are considered; the contradicted claims in the original complaint are knocked out."); *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Nisbet v. Van Tuyl*, 224 F.2d 66, 71 (7th Cir. 1955)) ("An amended pleading ordinarily supersedes the prior pleading. The prior pleading is in effect withdrawn as to all matters not restated in the amended pleading and becomes functus officio."). Notwithstanding their conspicuous revisions, the Court will assume that Plaintiffs, in fact, do have evidentiary support for these altered allegations, particularly in light of the fact that Plaintiffs purport to be basing at least some of their new assertions on information gleaned from discovery obtained in the interim. Despite Defendant's urging that the Court ascribe insincere motives to Plaintiffs, the Court will accept well-pleaded facts as true and will draw all reasonable inferences in Plaintiffs' favor. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

For the reasons stated below, however, the Court grants Defendants' motions to dismiss in their entirety [210, 215].

## I.     Background[1]

Louis Bianchi ("Bianchi"), the State's Attorney in McHenry County, Illinois, and three of his employees – Joyce Synek ("Synek"), Ronald Salgado ("Salgado"), and Michael McCleary ("McCleary") – allege that they were investigated and prosecuted in violation of the U.S. Constitution and Illinois state law.   Bianchi asserts that after assuming office in December 2005, he instituted several reforms in the State's Attorney's Office ("SAO") that "frustrated political operatives," who were no longer experiencing the perks that the prior regime afforded them.  2nd Amend. Compl. ¶¶ 9-10.  Specifically, Bianchi lengthened the workday in the SAO, fired incompetent employees, and discontinued favorable treatment for "friends of the previous administration."  *Id.*  As Plaintiffs tell it, during Bianchi's "highly contentious" bid for re-election in 2008, these frustrated political operatives morphed into full-fledged enemies, who would stop at nothing to keep him out of office and reinstate the status quo.  *Id.* at 13.  When Bianchi won the election, his "political enemies initiated a politically motivated conspiracy to override the election and force Bianchi from office . . . [to] allow his political opponents to install a State's Attorney who would do their bidding."  *Id.* at 15.

The saga began in July 2006 when Amy Dalby ("Dalby") resigned as a secretary in the SAO.   According to Plaintiffs, on her way out, Dalby – prodded by Assistant State's Attorney Kristin Foley ("Foley"), whom Bianchi had recently demoted from Chief of the SAO's Civil Division – stole 5,000 sensitive documents concerning pending cases.  *Id.* at 17.  Foley allegedly took the documents from Dalby and turned them over to the media and to Daniel Regna ("Regna"), Bianchi's opponent in the 2008 Republican

---

[1] The facts are drawn from Plaintiffs' second amended complaint.  As noted, for the purposes of Defendants' motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint.  See *Killingsworth*, 507 F.3d at 618.

primary, for use in his campaign against Bianchi. *Id.* at 19. In November 2007, Bianchi petitioned a court to appoint a special prosecutor to investigate the document theft. *Id.* at 20. Dalby was arrested and charged with six felonies in March 2009, and she pleaded guilty to computer tampering three months later. *Id.* at 21. In February 2009, prior to Dalby's arrest, Regna petitioned the Circuit Court of McHenry County to appoint a special prosecutor to investigate Bianchi, alleging that Dalby performed "political work" while working in the SAO. *Id.* at 22. Dalby then filed a similar petition in April 2009. *Id.* at 23. In September 2009, McHenry County Circuit Judge Gordon Graham granted Dalby's petition and appointed Henry Tonigan III ("Tonigan") as a special state's attorney to investigate and/or prosecute any persons implicated by Dalby's allegation. Judge Graham also appointed McQueen, but merely to "assist" Tonigan, by Plaintiffs' characterization.[2] *Id.* at 25.

In October 2009, Tonigan and McQueen interviewed Dalby and learned that the statute of limitations barred any prosecutions related to Dalby's complaints. *Id.* at 28. Yet rather than ceasing their investigation, Tonigan instead sought expansion of the scope of their appointment in a November 2009 letter to Judge Graham. *Id.* at 30. Judge Graham then vested Tonigan with the power to investigate and/or prosecute "any and all persons relative to the possible misuse, misappropriation or theft of public funds, public

---

[2] Notably, Plaintiffs filed their First Amended Complaint ("FAC") in this case on May 4, 2012. That complaint contained allegations that Tonigan and McQueen worked together to fabricate evidence and prosecute Plaintiffs without probable cause. Tonigan and his law firm then settled with Plaintiffs and were dismissed with prejudice from the case on July 24, 2012 and November 9, 2012, respectively. The Court dismissed Plaintiffs FAC as to the remaining Defendants on January 11, 2013. On February 8, 2013, Plaintiffs filed the Second Amended Complaint at issue here, which, as noted, contains drastically different characterizations of McQueen and Tonigan's roles in Plaintiffs' prosecution as compared with the First Amended Complaint.

property or public personnel by McHenry County States Attorney Louis Bianchi from 2005 and thereafter." *Id.* at 31.

"Around December of 2009," Tonigan retained investigative firm Quest Consultants to "assist in the investigation of Bianchi," and the court appointed Quest employees Jerger, Scigalski, Reilly, Hanretty, and Stilling (who are also referred to as the "Quest Investigators" in Plaintiffs' complaint) as special investigators. *Id.* at 32. New to Plaintiffs' narrative in the Second Amended Complaint is the allegation that McQueen led Quest Consultants' investigative effort. As Plaintiffs now tell it, McQueen not only interviewed witnesses himself, but directed the Quest Defendants regarding "who to interview, what questions to ask, and what information to document and not document." *Id.* at 34. Also added in this version of the complaint is the contention that McQueen and the Quest Defendants "made a concerted effort to limit Tonigan's role in and knowledge of their investigation." *Id.* at 35. Whereas in Plaintiffs' first amended complaint, they alleged that "McQueen and/or Tonigan, along with Quest Investigators" interviewed witnesses and manufactured evidence, Plaintiffs now allege that "after a reasonable opportunity for further investigation or discovery, there will likely be evidentiary support that during the investigation, Defendants McQueen and Quest Investigators purposefully presented Tonigan with manufactured inculpatory evidence and concealed material and exculpatory information from Tonigan." In their first amended complaint, Plaintiffs alleged that Quest Defendants created reports with "false and manufactured evidence" concerning the statements of various assistant state's attorneys at Tonigan "and/or" McQueen's behest; Plaintiffs now have updated that allegation to remove Tonigan from the wrongdoing. Their new complaint specifically alleges that "after a reasonable

opportunity for further investigation or discovery, there likely will be evidentiary support that the false evidence manufactured during the investigation by Defendant McQueen and Defendant Quest Investigators was done without Special Prosecutor Tonigan's knowledge." *Id.* at 44.

Also new to Plaintiffs' accusations is that McQueen and the Quest Defendants "were secretly obtaining information from Bianchi's political enemies in furtherance of the conspiracy to violate Plaintiffs' constitutional right * * * *" *Id.* at 45. Plaintiffs contend that McQueen and the Quest Defendants concealed their relationship and communications with Bianchi's enemies, which came to light through discovery obtained by Plaintiffs in May 2012. *Id.*

In April 2010, Judge Graham convened a grand jury and appointed the Quest Defendants as agents of the grand jury. *Id.* at 47. Plaintiffs allege that after the special grand jury was convened, McQueen continued to micromanage the Quest Defendants' investigative efforts and presented to the grand jury the false evidence that they jointly concocted. *Id.* at 48. Plaintiffs assert that both McQueen and Scigalski made numerous false statements before the grand jury, and that "[a]fter a reasonable opportunity for further investigation or discovery, there likely will be evidentiary support that Tonigan did not know that the evidence was false." *Id.* at 48-49. This is an update to the allegation in their first amended complaint that Tonigan "either *knew*" that McQueen's grand jury statements were false "*or*" he incorrectly believed they were true. Plaintiffs now allege that Tonigan "had the sole responsibility and authority for determining what charges to bring against Bianchi and Synek" and that McQueen and the Quest Defendants

used the false evidence and also concealed exculpatory evidence to "dupe" Tonigan into bringing charges against Bianchi and Synek. *Id.* at 51.

In September 2010, the grand jury returned indictments against Bianchi for conspiracy to commit official misconduct and obstruction of justice, nineteen counts of official misconduct, and unlawful communication with a witness. The grand jury indicted Synek for conspiracy to commit official misconduct and obstruction of justice, four counts of perjury, and obstruction of justice. *Id.* at 53-54. Although their first amended complaint alleged that these indictments were based on false evidence that Quest Defendants fabricated "in concert with Defendant McQueen and/or Tonigan," their contention now is that Tonigan had no knowledge of any wrongdoing or falsity with respect to the grand jury evidence. *Id.* at 56. An arrest warrant was issued and Bianchi and Synek were arrested. *Id.* at 58.

Plaintiffs allege that because the indictment lacked an allegation that Bianchi committed an actual underlying crime, McQueen and Stilling interviewed McHenry County Administrator Peter Austin on October 21, 2010. According to Plaintiffs, Stilling and McQueen conspired to withhold exculpatory evidence provided by Mr. Austin – namely, that McHenry County's personnel policies allowed Bianchi to use county property for personal use – and fabricated his witness statement, which Tonigan then relied on in deciding to present a superseding indictment to the special grand jury. *Id.* at 62-65. The special grand jury returned a superseding indictment on October 22, 2010, alleging that Bianchi and Synek committed "theft of labor, services, and use of property" of McHenry County (720 ILCS 5/16-3). *Id.* at 67.

Shortly after obtaining the first indictment, McQueen filed a petition to expand the investigation of Bianchi and SAO employees. *Id.* at ¶ 76. In October 2010, Judge Graham "signed an order granting Defendant McQueen and Tonigan authority to investigate and prosecute individuals for using their official position in the SAO to give benefits in criminal prosecutions to friends, relatives, and supporters." *Id.* at ¶ 79. According to Plaintiffs, Defendants again presented false evidence to the grand jury. *Id.* at 87. Again, Plaintiffs allege that false evidence was manufactured and that exculpatory evidence was withheld. *Id.* In their first amended complaint, Plaintiffs alleged that Tonigan "either participated" in the wrongdoing "*or*" that he was unaware of it. Now, Plaintiffs allege that Tonigan neither participated in it nor was he aware of it. *Id.* at 85. Rather, Tonigan "innocently relied" on it. *Id.* at 89. Plaintiffs also now maintain that McQueen and the Quest Defendants "continued to secretly obtain information from Bianchi's political enemies, in furtherance of the conspiracy to violate the Plaintiffs' rights" and "revealed confidential information to Bianchi's political enemies during the course of their investigation." *Id.* at 86.

In February 2011, the grand jury returned indictments against Bianchi for three counts of official misconduct for improperly intervening in criminal cases on behalf of friends and political supporters, against Salgado for official misconduct for intervening in a criminal case on behalf of his nephew, and against McCleary for official misconduct related to improper use of a county vehicle. *Id.* at 90, 91, 100. As a result of the indictments, warrants were issued, and Bianchi, Salgado, and McCleary were arrested. *Id.* at 92, 101.

Shortly after the second indictment, Tonigan, McQueen, and Scigalski held a press conference where McQueen repeated the allegations contained in the indictments against Bianchi, Salgado, and McCleary. According to the complaint, McQueen also said things about Plaintiffs that went beyond the indictments, such as that "after the return of the first indictment Scigalski received calls from a number of lawyers regarding cases handled by Bianchi and that those cases suggested that the equal protection rights of all defendants were not being upheld because of favoritism." *Id.* at 102.

The Illinois Supreme Court appointed Judge Joseph McGraw from the Seventeenth Judicial District to preside over the cases, after all of the judges in McHenry County recused themselves. *Id.* at 68. In their first amended complaint, Plaintiffs alleged that Quest Defendants withheld exculpatory evidence. Plaintiffs now allege that Quest Defendants *and* McQueen were the culprits and that they withheld this exculpatory evidence from Tonigan, who "did not know about the concealed exculpatory evidence" and who "would not have continued with the criminal prosecutions . . . had he known of its existence." *Id.* at 69, 71.

In March 2011, after a two day bench trial, Judge McGraw granted Bianchi's and Synek's Motion for a Directed Finding and acquitted them of all charges in the first indictment. *Id.* at 74. On June 3, 2011, Judge McGraw dismissed the charges of official misconduct against Salgado "based on the failure of the charge to state an offense" against him. *Id.* at 112. On June 29, 2011, the charge of official misconduct was dismissed against McCleary for that same reason. *Id.* at 113. In August 2011, after a second bench trial, Judge McGraw granted Bianchi's motion for a directed finding and acquitted Bianchi of the remaining charges. *Id.* at 114.

On January 18, 2012, Plaintiffs filed this suit against Tonigan, McQueen, Quest Defendants, Quest Consultants, Tonigan's law firm, and unknown co-conspirators. Plaintiffs filed a first amended complaint [70] on May 5, 2012. Plaintiffs then settled with Tonigan, and he and his law firm were dismissed from the case. Against the remaining Defendants, Plaintiffs asserted fifteen claims under federal and state law. Defendants moved to dismiss based on absolute and qualified immunity. On January 11, 2013, the Court granted Defendants' motions to dismiss, but gave Plaintiffs 28 days to replead. On February 28, 2013, Plaintiffs' filed the fifteen-count second amended complaint [198] at issue here. Counts I-III allege false arrest and conspiracy in violation of 42 U.S.C. § 1983 pursuant to the Fourth Amendment. Counts IV and V allege due process violations and conspiracy under 42 U.S.C. § 1983 pursuant to the Fourteenth Amendment, stemming from evidence fabrication and failure to disclose exculpatory evidence. Counts VI and VII allege violations of 42 U.S.C. § 1983 pursuant to the First Amendment based on Defendants' prosecution of Plaintiffs in retaliation for Bianchi's decision to seek and hold office and a conspiracy to do the same. Counts VIII-X allege state law malicious prosecution and conspiracy claims. Counts XI-XIV allege state law intentional infliction of emotional distress and conspiracy claims. Count XV alleges a state law defamation and conspiracy claim.

Defendants again moved to dismiss. After the parties submitted their briefs on the motion to dismiss, the Seventh Circuit issued its decision in *Fields v. Wharrie*, 2014 WL 243245 (7th Cir. Jan. 23, 2014), which the parties have addressed in supplemental briefs.

## II.      Motion to Dismiss Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiffs' complaint and draws all reasonable inferences in their favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir.

1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

III.    **Analysis**

Defendants seek dismissal of Plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"). As an initial matter, they assert that numerous allegations contained within Plaintiffs' complaint are insufficient *per se*, because they are prefaced with "after a reasonable opportunity for further investigation or discovery, there likely will be evidentiary support . . . ." Defendants argue that this phrase demonstrates Plaintiffs' lack of an appropriate factual basis, such that Plaintiffs have failed to state a claim with respect to these allegations. Plaintiffs argue that this qualifier is necessary where used and in compliance with FRCP 11(b)(3). As to all counts, Defendants contend that Plaintiffs have failed to state a claim for which relief may be granted, because Plaintiffs' complaint is "riddled with conclusory allegations" and "legal conclusions." Regarding Plaintiffs' federal claims, McQueen argues that he is entitled to either absolute or qualified immunity. As to Plaintiffs' state law claims in Counts VIII-XIV, McQueen contends that both absolute and sovereign immunity shield him from suit. As to Count XV, all Defendants assert that a common law privilege protects them from liability for the state law defamation claim. McQueen also makes the (somewhat confusing) argument that, with respect to Bianchi and Synek, all fifteen claims are barred by virtue of a settlement they entered into with McHenry County, in which Bianchi and Synek assigned their right to recover monetary damages to the County. As to all claims, Quest Defendants argue that they are entitled to absolute immunity with respect to their grand jury testimony and qualified immunity as to any

allegation relating to their investigatory actions. Finally, with respect to Plaintiffs' conspiracy claims – which they appear to allege in conjunction with all fifteen counts – Defendants argue, in essence, that these are simply bare allegations that Plaintiffs tacked on to each claim that lack a factual basis in the complaint.

### A.    Federal Claims

Plaintiffs assert the same seven federal claims in their seconded amended complaint as they did in their first amended complaint, each under 42 U.S.C. § 1983 for alleged violations of their constitutional rights by state officials acting under color of state law. Counts I - III are for false arrest. Counts IV - V allege that Defendants violated Plaintiffs' due process rights both by fabricating evidence and by failing to disclose exculpatory evidence. Counts VI - VII assert that Defendants charged and prosecuted Plaintiffs as retaliation for Bianchi's decision to "seek and hold" public office. Each Count contains "(Conspiracy)" following the substantive allegation (*e.g.*, "Count IV Fourteenth Amendment-Due Process Violations (Conspiracy)"), so the Court will treat each Count as both a claim for the underlying Constitutional violation as well as a separate claim for conspiracy to commit it.

Relevant here, the Supreme Court has held that witnesses before a grand jury, witnesses at trial, and prosecutors acting in furtherance of their prosecutorial duties are entitled to absolute immunity. *Rehberg v. Paulk*, 132 S. Ct. 1497, 1503, 1506 (2012). However, those acting under color of state law in an investigatory role, including prosecutors, may claim only qualified immunity. See *Buckley v. Fitzsimmons*, 509 U.S. 259, 270 (1993). Whether a prosecutor is acting within the scope of his prosecutorial duties, and is therefore entitled to absolute immunity, "hinges on whether the prosecutor

13

is, at the time, acting as an officer of the court, as well as on his action's relatedness to the judicial phase of the criminal process." *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012). Prosecutorial immunity "extends beyond an individual prosecutor's decision to indict or try a case." *Id.* (citing *Van de Kamp v. Goldstein*, 555 U.S. 335, 344-48 (2009). It protects the "functioning of the public office" and so "encompasses any action directly relevant to a prosecutor's ability to conduct a trial," (*id.*), or put on evidence or witness testimony before a grand jury. *Rehberg*, 132 S. Ct. at 1506. But when a prosecutor is "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested," then the prosecutor is acting as a detective and is not entitled to greater immunity. See *Buckley*, 509 U.S. at 273, 276. "In other words, '[w]hen the functions of prosecutors and detectives are the same * * * the immunity that protects them is also the same.'" *Lewis v. Mills*, 677 F.3d 324, 330 (7th Cir. 2012) (quoting *Buckley*, 509 U.S. at 276).

Qualified immunity "protects government officials from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Viilo v. Eyre*, 547 F.3d 707, 709 (7th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is immunity from suit rather than merely a defense to liability. *Scott v. Harris*, 550 U.S. 372, 376 n. 2 (2007). The qualified immunity analysis comprises a two-part inquiry: (i) "whether the facts alleged show that the state actor violated a constitutional right," and (ii) "whether the right was clearly established." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).

Last time, Plaintiffs' narrative was, in essence, that Quest Defendants, McQueen, "and/or" Tonigan worked in concert to fabricate and present false evidence to the grand jury as retaliation for Bianchi's decision to seek re-election as McHenry County State's Attorney. The Court determined that McQueen was entitled to absolute immunity, since Plaintiffs failed to allege that McQueen acted in a non-prosecutorial role. Order Granting Mot. to Dismiss [195] at 12-14. In their amended complaint, Plaintiffs now allege that McQueen was merely an investigator, who was never appointed to be a prosecutor in the first place. This revelation, Plaintiffs argue, effectively removes McQueen's cloak of absolute prosecutorial immunity. Plaintiffs argue that their new, more detailed, allegations against the investigatory team renders the Quest Defendants, as well as McQueen, unprotected by qualified immunity and liable for violating Plaintiffs' clearly established Fourth (false arrest), Fourteenth (due process), and First Amendment (retaliatory prosecution) rights.

As an initial matter, having taken judicial notice of the various court orders that are attached to the instant motions, the Court flatly rejects Plaintiffs' contention that McQueen was not a prosecutor in the underlying case. Plaintiffs "are not questioning that during the criminal prosecutions McQueen held himself out as a special prosecutor;" rather, they contend that he did so despite never being appointed as a prosecutor in the case. Plaintiffs argue that 55 ILCS 5/3-9008 – the special prosecutor statute pursuant to which Judge Graham made his appointments – only permits the appointment of one "special prosecutor" and not two. Pl. Opp. Motion at 12 n.3. The clear language of the statute itself belies this claim: "[a]ny attorney appointed for any reason under this Section shall possess all the powers and discharge all the duties of a regularly elected State's

attorney."  Plaintiffs also argue that the language in Judge Graham's appointment order suggests that Judge Graham appointed Tonigan as a special prosecutor, but merely appointed McQueen as his non-prosecutor assistant.   See Judge Graham Order Appointing Special Prosecutor, Sept. 18, 2009 ("Attorney Thomas K. McQueen shall assist the specially appointed prosecutor, Henry C. Tonigan III, as directed by him on all matters relative to this case.").   But Plaintiffs ignore the subsequent orders by Judge Graham that clarified any ambiguity that can be teased out of his appointment order.  See *e.g.*, Judge Graham Order Amending Scope of Investigation and/or Prosecution Oct. 1, 2010 ("Special State's Attorneys Henry C. Tonigan III and Thomas K. McQueen, previously appointed in this matter . . .").  Moreover, the Illinois Appellate Court – not to mention Plaintiffs themselves – also recognized both Tonigan and McQueen to be Special State's Attorneys throughout the underlying proceedings.  See *In re Appointment of Special Prosecutor*, 2012 WL 6969007, at *1 n.1 (Ill. App. Ct. Sept. 25, 2012) ("Tonigan was appointed as special prosecutor, and McQueen was appointed as an assistant to the special prosecutor.  Throughout this order, we refer to them jointly as Special Prosecutors."); see also Bianchi and Synek's Mot. Dismiss Indictment Nov. 23, 2010 ("The special state's attorneys in this case, Attorney Henry Tonigan, III and Attorney Thomas K. McQueen, convened a special grand jury, utilized the grand jury as an investigative body, presented evidence and witnesses to the grand jury, and subsequently sought and obtained the indictment that was returned against the Defendants in this case.").   Further, Judge Graham ordered that both Tonigan and McQueen be compensated at the exact same hourly rate ($250/hour).  Pl. Opp. Mot. ¶ 27. While Judge Graham's appointment order makes clear that he was appointing McQueen

as Tonigan's assistant, there is no question that Judge Graham appointed both men – Tonigan as Special State's Attorney, McQueen as Assistant Special State's Attorney – to "investigate and/or prosecute" the matter. See Judge Graham Order Appointing Special Prosecutor, Sept. 18, 2009.

That being said, the case law is clear that McQueen's status as a prosecutor alone does not afford him blanket protection from suit by way of absolute immunity. "Prosecutors are absolutely immune from suits for monetary damages under § 1983 for conduct that is 'intimately associated with the judicial phase of the criminal process.'" *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). "A prosecutor is shielded by absolute immunity when he acts 'as an advocate for the State' but not when his acts are investigative and unrelated to the preparation and initiation of judicial proceedings." *Id.* (citing *Buckley*, 509 U.S. at 272). The level of immunity to which McQueen is entitled thus turns on the function that he was performing at the time of the alleged misconduct.

Here, Plaintiffs recognize that McQueen is not subject to liability "for prosecuting Plaintiffs without probable cause, reviewing witness statements, interviewing witnesses prior to their testimony before the grand jury or at trial, or for presenting false testimony before the grand jury." Pl. Opp. Mot. at 18. Their causes of action rest entirely on alleged acts of evidence fabrication, which they claim McQueen committed while acting in a purely investigatory capacity alongside the Quest Defendants. Implicit in this claim against McQueen is that there was a period of time following Judge Graham's appointment, prior to engaging in grand jury-related prosecutorial duties, when McQueen was acting solely as an investigator and not yet as an advocate for the State. For his part,

McQueen has failed to demonstrate (and the Court has found no authority that suggests) that he was entitled to absolute immunity at the moment of his appointment. Without additional information about the investigative and prosecutorial process that McQueen, Tonigan, and the Quest Defendants undertook, it may be that there was a period of time in the early stages of their investigation when they were gathering facts in a way that was not yet intimately associated with the initiation of judicial proceedings. See *Buckley*, 509 U.S. at 273 (describing a prosecutor's mission as "entirely investigative in character" when there was no "probable cause to arrest petitioner or to initiate judicial proceedings"). It did take seven months of investigation before a grand jury was convened.

The problem that Plaintiffs still face with respect to McQueen, however, is that – although they allege that he "fabricated" and "manufactured" evidence countless times throughout their complaint – most (and arguably all) of the allegations against McQueen involve his behavior during or in preparation for the grand jury proceedings, (see *e.g.*, 2nd Amend. Compl. ¶ 48(a)), or took place after the grand jury had been convened (see *e.g.*, *id.* at ¶ 62). As discussed above, McQueen, as a prosecutor, is entitled to absolute immunity for those grand jury-related actions. The rest of Plaintiff's allegations with respect to McQueen are vague and are alleged generally as to a large window of time (October 2009-August 2010). See *e.g.*, 2nd Amend. Compl. ¶ 35 (alleging that sometime between October 2009 and August 2010, "after a reasonable opportunity for further investigation or discovery, there likely will be evidentiary support that during the investigation, Defendants McQueen and the Quest Investigators purposefully presented Tonigan with manufactured inculpatory evidence . . . ."). Nevertheless, as set forth

below, even if the Court accepts these vague allegations as well-pled claims of evidence fabrication occurring during the course of McQueen's purely investigative conduct, McQueen still would be entitled to qualified immunity.

Unlike McQueen, the Quest Defendants are entitled to absolute immunity only with respect to their testimony before the grand jury. See *Rehberg*, 132 S. Ct. at 1506. For all other conduct, regardless of whether judicial proceedings had been initiated, the Quest Defendants at most are entitled to qualified immunity, *Filarksy v. Delia*, 132 S. Ct. 1657, 1665-68 (2012). Like McQueen, the Quest Defendants are shielded by qualified immunity, because Plaintiffs have failed to allege any violation of a clearly established constitutional right. See *Hanes*, 578 F.3d at 493.

### 1.     False Arrest

In Counts I-III, Plaintiffs claim that Defendants' alleged evidence fabrication caused them to be "unlawfully detained, arrested, and falsely charged . . . without probable cause" in violation of their Fourth Amendment rights. Plaintiffs do not allege that Defendants falsely arrested them. Rather, they allege that Defendants "accomplished an unlawful result" by fabricating evidence that led to Plaintiffs' ultimate arrest. Put differently, Plaintiffs argue that McQueen and the Quest Defendants violated Plaintiffs' constitutional rights by fabricating evidence, presenting it to Tonigan, and then testifying falsely before the grand jury, all of which later caused someone else (law enforcement) to falsely arrest them. But "the interest in not being prosecuted groundlessly is not an interest that the Fourth Amendment protects." *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 638 (7th Cir. 2008). Plaintiffs' allegations make out claims for malicious prosecution, not false arrest. See *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011) (holding

that a plaintiff who was "summoned into court and prosecuted without probable cause" has a malicious prosecution claim, rather than a Fourth Amendment claim).

When a plaintiff alleges that he suffered a "deprivation of liberty from prosecution and a contrived conviction . . . deliberately obtained from the use of false evidence, his claim is, in essence, one for malicious prosecution." *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003). Malicious prosecution "is a deliberate accusation of wrongdoing calculated to embarrass the defendant, disrupt his activities, and put him to the expense of defending himself." *Albright v. Oliver*, 975 F.2d 343, 346 (7th Cir. 1992). "Malicious prosecution can result in a person's being thrown into jail to await trial, and incarceration is of course no less a deprivation of liberty within the meaning of the due process clause than exclusion from an occupation." *Id.* Plaintiffs' allegations and their complained-of effects mirror those described in *Albright* and *McCann*. Moreover, the Seventh Circuit has "rejected the tripartite formula for a constitutional tort of malicious prosecution – that is, analyzing the claim first as one for unlawful arrest under the Fourth Amendment; then, as pretrial detainees, under substantive due process; and, after trial, under the Eighth Amendment protections against cruel and unusual punishment. *Lee v. City of Chicago*, 330 F.3d 456, 463 n.4 (7th Cir. 2003) (citing *Newsome v. McCabe*, 256 F.3d 747, 750-751 (7th Cir. 2000)). As described in more detail below, Plaintiffs may only bring their malicious prosecution allegations as state law claims, which they appropriately have done in Counts VIII-X. Because Plaintiffs have not stated a constitutional claim for false arrest, Defendants' are entitled to qualified immunity and Counts I-III are dismissed.

## 2. Due Process

In Counts VI-V, Plaintiffs allege that Defendants "attempted to secure [a] wrongful conviction . . . by fabricating witness statements, manufacturing evidence, suppressing exculpatory evidence and continuing to conceal their wrongdoing . . . during the criminal proceedings." Plaintiffs' allegation contains two seemingly distinct due process claims: one for evidence fabrication and another based on the withholding of material exculpatory evidence in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963). As such, the Court will analyze each claim separately.

Until recently, it seemed to be settled law in the Seventh Circuit that allegations of evidence fabrication do not state a cognizable due process claim. See *Fields v. Wharrie*, 672 F.3d 505, 516-17 (7th Cir. 2012) ("*Fields I*") ("In *Buckley v. Fitzsimmons* . . . . We explained that fabricating evidence, including in the form of testimony, is not an actionable constitutional wrong.") (citing *Buckley v. Fitzsimmons*, 20 F.3d 789, 795-96 (7th Cir. 1994)); see also *Fields v. Wharrie*, 2014 WL 243245, at *10 (7th Cir. Jan. 23, 2014) ("*Fields II*") (Sykes, J., dissenting) (noting that "*Buckley* contains two important principles of immunity law that apply in suits alleging prosecutorial misconduct: (1) a prosecutor who uses fabricated evidence at trial may violate *Brady*, but is absolutely immune from suit, and (2) a prosecutor's fabrication of evidence against a suspect during an investigation is covered by qualified immunity because it doesn't violate a clearly established constitutional right."). Prior to *Fields I*, the Seventh Circuit had held that when a plaintiff alleges that "criminal proceedings were instituted against him based on false evidence or testimony, such a claim 'is, in essence, one for malicious prosecution, rather than a due process violation,'" (*Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th

Cir. 2009) (quoting *McCann*, 337 F.3d at 786))), and that a plaintiff's attempt to bring an evidence fabrication claim under the due process clause was an improper attempt at "shoe-horning into the more general protections of the Fourteenth Amendment," rather than bringing a state law malicious prosecution claim. *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (citing *Brooks*, 564 F.3d at 833, and *McCann*, 337 F.3d at 786)). Previously, the Seventh Circuit had said that "[t]he existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution," *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001), and that plaintiffs "cannot invoke the substantive due process clause where state laws provide an adequate postdeprivation remedy for the complained-of conduct." *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010). Reading these cases together, judges in the Northern District of Illinois typically drew one of two conclusions that led to the same result: (1) fabricating evidence does not violate due process, (see *Chihak v. City of Chicago*, 2013 WL 3944411, at *3 (N.D. Ill. July 31, 2013) ("the Seventh Circuit has reaffirmed its holding in *Brooks* that the fabrication of evidence does give rise to a constitutional claim")), or (2) fabricating evidence may violate due process, but the existence of a state law tort for malicious prosecution dictates that a plaintiff must bring his claim pursuant to state law rather than as a due process claim under Section 1983. See *Caine v. Burge*, 2012 WL 2458640 at *6 (N.D. Ill. June 27, 2012) ("[a]n attempt to plead [that Defendants fabricated reports and evidence resulting in a wrongful prosecution] as violations of due process is foreclosed and does not give rise to an entitlement for relief under § 1983"). Either way, it appeared to be improper to bring an evidence fabrication-based due process claim under Section 1983.

The Seventh Circuit has called this conclusion into question, however, first in *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012), and again just recently in *Fields II*, both of which indicate that an allegation of evidence fabrication, in fact, can support a due process claim under Section 1983.  In *Whitlock*, the Seventh Circuit held that a prosecutor who fabricated evidence in the investigatory stage of a prosecution could not claim qualified immunity, because his actions violated the defendant's clearly established due process rights.  *Whitlock*, 682 F.3d at 580.  By itself, this holding did not necessarily contradict the collective pronouncements of *Fox, Brooks, McCann*, and *Newsome*, because it seemed that the cases could be read in harmony:  evidence fabrication may violate your due process rights, but the existence of state law malicious prosecution could still knock out your federal claim.  *Fields II*, however, suggests that this reading is incorrect.

*Fields II* clarifies that *Whitlock* definitively stands for the proposition that a prosecutor can violate one's due process rights by fabricating evidence if that evidence is later used to deprive the defendant of liberty in some way.  See *Fields II*, 2014 WL 243245 at *4; *Whitlock*, 682 F.3d at 580.  Although this would seem to directly contradict *Buckley* (as the dissent argues), the majority reconciled the two cases by distinguishing *coercing* witness testimony (the primary allegation in *Buckley*) from *fabricating* witness testimony (the allegations in *Whitlock* and *Fields II*).  *Id.*  The Court determined that the former does not violate due process, while the latter does.  *Id.*  Moreover, the Seventh Circuit concluded that because fabricating evidence violates a clearly established constitutional right, qualified immunity does not shield its perpetrators from liability.  *Id.* at *5 (citing *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *Pyle v. Kansas*, 317 U.S. 213

(1942); *Mooney v. Holohan*, 294 U.S. 103, 110, 112-13 (1935) (per curiam)). In light of *Fields II*, it is apparent that allegations of evidence fabrication can support a due process claim under Section 1983. And because neither *Whitlock* nor *Fields II* addressed the effect (if any) that the availability of state law malicious prosecution has on such a claim, it seems that malicious prosecution does not enter the calculus and knock out the availability of Section 1983 as a remedy, despite what *Brooks*, *Fox*, *et al.* may suggest.

And so the Court turns to the precise contours of the constitutional right to be free from evidence fabrication articulated in *Whitlock* and *Fields II*. In both cases, the plaintiff had been convicted, sentenced, and jailed for crimes that he did not commit. Whitlock and his co-defendant Steidl spent 17 years and 21 years in prison, respectively. *Whitlock* 682 F.3d at 570. Fields also spent 17 years in prison. *Fields II*, 2014 WL 243245 at *1. Both *Whitlock* and *Fields II* determined that the right to be free from evidence fabrication was clearly established (and thus qualified immunity was made unavailable) by the Supreme Court's decisions in *Mooney* (1935), *Pyle* (1942), and *Napue* (1959). In those cases, "the Supreme Court held that a prosecutor violates due process when she knowingly uses perjured testimony *to secure a conviction*." *Whitlock* 682 F.3d at 582 (emphasis added). Grounding the right in those cases, the Seventh Circuit in *Whitlock* said that "plaintiffs properly alleged that the act of fabrication caused a harm to them: the fabricated evidence, because it was introduced against them at trial, *was instrumental in their convictions*." *Id.* (emphasis added). *Whitlock* also noted that the Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process *if that evidence is later used to deprive the defendant of her liberty in some way*." *Whitlock*, 682 F.3d at 580 (emphasis

added). *Whitlock* therefore suggests that one's due process right is only violated if fabricated evidence secures a wrongful conviction, a reading that the Seventh Circuit confirmed in *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012), the only case besides *Fields II* in which the Court has discussed its holding in *Whitlock*.

*Alexander* involved a plaintiff, acquitted by a jury in his criminal case, who alleged that the prosecutor and investigators conspired "to manufacture false evidence and bring trumped-up charges." 692 F.3d at 554. In discussing whether the plaintiff, who heavily relied on the Second Circuit's decision in *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000), stated a cognizable due process right, the Court said that:

> [In *Whitlock v. Brueggemann*] we held that a prosecutor acting in an investigatory capacity who fabricates evidence that is used to obtain a wrongful conviction violates a convicted defendant's clearly established due process rights. There, the plaintiffs, Whitlock and Steidl, alleged that police officers and prosecutors used fabricated evidence, such as pressuring witnesses to concoct stories of having witnessed the crime, to convict the two of a high-profile double homicide. Whitlock and Steidl spent the next seventeen and twenty-one years in prison, respectively. In both *Zahrey* and *Whitlock*, the alleged liberty deprivation came not from the initial arrest, but from the time spent in confinement *after* arrest – the eight months Zahrey spent in jail after having his bail revoked and the numerous years Whitlock and Steidl spent in prison after being wrongfully convicted. *Zahrey* and *Whitlock* are inapposite because the only liberty deprivation Alexander alleges stems from his initial arrest – he was released on bond that same day.

*Id.* at 557 (emphasis in original) (internal citations omitted). The Seventh Circuit went on to say: "[n]or does the burden of appearing in court and attending trial, in and of itself, constitute a deprivation of liberty . . . . It would be anomalous to hold that attending a trial deprives a criminal defendant of liberty without due process of law, when the purpose of the trial is to *effectuate* due process." *Id.* at 557 n.2 (emphasis in original).

Thus, in *Alexander*, the Seventh Circuit clarified that a defendant's due process rights are not violated unless fabricated evidence is used to wrongfully convict or incarcerate him.

*Alexander* is not disturbed by the majority's statement in *Fields II* that, "as in our recent decision in *Julian v. Hanna*, 732 F.3d 842, 847 (7th Cir. 2013), the fabrication of evidence harmed the defendant before and not just during trial, because it was used to help indict him." *Fields II*, 2014 WL 243245 at *3. In fact, this citation to *Julian* helps to explain the absence of any discussion of malicious prosecution in *Whitlock*, *Alexander*, and *Fields II*. In the cited portion of *Julian*, a case that held that false arrest/imprisonment under Indiana law provided an inadequate remedy for a malicious prosecution claim based on evidence fabrication, the Seventh Circuit noted that "damages [for malicious prosecution] accumulated over the entire period that began with [plaintiff's] arrest and ended only when the charges against him were dismissed – a period of 9 years and 3 months." *Julian*, 732 F.3d at 847. In Illinois, the requisite elements for a claim of malicious prosecution are (1) the defendants commenced judicial proceedings, (2) for which there was no probable cause, (3) the proceedings were instituted or continued maliciously, (4) the proceedings were terminated in the plaintiff's favor, and (5) the plaintiff sustained an injury. See *Sneed v. Rybicki*, 146 F.3d 478, 480 (7th Cir. 1998). *Julian*, therefore, helps to explain how the *Brooks*, *Fox*, *McCann* line of cases affects the analysis of evidence fabrication claims. As *Alexander* demonstrates, fabricating evidence only violates a clearly established constitutional due process right if it results in a wrongful conviction or incarceration. Short of that, an evidence fabrication claim is, in essence, a claim of malicious prosecution (*i.e.*, a claim that the plaintiff was arrested and prosecuted without probable cause), which, in Illinois, must be brought

pursuant to state law. See *Brooks*, 564 F.3d at 833; *Fox*, 600 F.3d at 841. And because a defendant cannot bring a malicious prosecution suit until his conviction is overturned, the practical effect of *Fields II* is that it provides an evidence fabrication claim for the convicted defendant whose conviction still stands. In other words, an acquitted defendant harmed by fabricated evidence only may bring a state law malicious prosecution claim (without a conviction, his due process rights have not been violated), a convicted defendant only may bring his evidence fabrication claim as a due process claim (his conviction is a bar to a malicious prosecution claim), and a defendant whose conviction gets overturned may bring both.

Here, Plaintiffs were not wrongfully convicted like the plaintiffs in *Whitlock* and *Fields II*; rather, they were acquitted like the plaintiff in *Alexander*. And they do not allege that fabricated evidence resulted in their wrongful incarceration. Instead, Plaintiffs contend that the evidence caused them to be indicted, arrested, and prosecuted in the absence of probable cause. Accordingly, Plaintiffs have not stated a violation of a clearly established constitutional right, and any evidence fabrication claim that they may have must be brought under state law.

Turning to Plaintiff's *Brady* claim, the Seventh Circuit in *Carvajal v. Dominguez*, 542 F.3d 561, 570 (7th Cir. 2008) noted that it is "doubtful . . . that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation." This is because the Seventh Circuit found "the following from the Supreme Court to be instructive on this point:

> [T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence – that is, to any suppression of so-called "*Brady* material" – although strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so

serious that there is a reasonable probability that the suppressed evidence
would have produced a different verdict.

*Id.* (citing *Strickler v. Greene*, 527 U.S. 263, 290 (1999)).  Later, in *Bielanski v. County of Kane*, 550 F.3d 632 (7th Cir. 2008), the Seventh Circuit reiterated the doubt expressed in *Carvajal*, noting that "[t]he Supreme Court has yet to address the situation . . . where evidence was withheld by the prosecution and yet the defendant was still acquitted" and that the Sixth, Tenth, and Eleventh Circuits have definitively concluded that a *Brady* claim is extinguished when a defendant is acquitted.  *Id.* at 644 (citing *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988).

Plaintiffs citation to *Alexander* cannot save the day.  In *Alexander*, the Seventh Circuit said:

> [W]e have expressed doubt that an acquitted defendant can ever establish
> the requisite prejudice for a *Brady* claim.  See *Bielanksi v. Cnty. of Kane*,
> 550 F.3d 632, 644 (7th Cir. 2008).  Nevertheless, we have entertained the
> possibility that prejudice could be established if an acquitted defendant
> showed that disclosure of the suppressed evidence would have altered the
> decision to go to trial.

692 F.3d at 556.  Seizing on this language, Plaintiffs second amended complaint alleges that Tonigan had the "sole" authority in deciding whether to prosecute Plaintiffs and McQueen and the Quest Defendants concealed exculpatory evidence in order to "dupe" Tonigan into prosecuting them.  But even accepting that claim as true, Defendants still are immune from suit.  Qualified immunity shields McQueen and the Quest Defendants for allegedly duping Tonigan, unless they (1) violated a constitutional right and (2) that right was "clearly established at the time and under the circumstances presented." *Whitlock*, 682 F.3d at 580 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

"Courts may take up those questions in whatever order seems best for the case at hand." *Id.* Here, we need not address question one, because the Seventh Circuit has shed sufficient light on question two. *Carvajal*, *Bielanski*, and *Alexander*, instruct that, at best, the "possibility" that an acquitted defendant has a *Brady* claim has been "entertained," but that the existence of such a claim is "doubtful." Therefore, the constitutional *Brady* right of an acquitted defendant, like Plaintiffs here, is far from "clearly established." Accordingly, Defendants are entitled to qualified immunity from Plaintiffs' due process claims and, and Counts IV-V are dismissed.

### 3. Retaliatory Prosecution

Counts VI-VII allege that McQueen and the Quest Defendants wrongfully charged and prosecuted Bianchi and Synek and then Salgado, McCleary, and Bianchi (a second time) "in retaliation against Bianchi for his decision to seek and hold public office, and in order to force Bianchi to resign and/or be forced from his elected position as McHenry County State's Attorney, and to render Bianchi unelectable in the future and prevent Bianchi from holding public office in the future." In their opposition brief, Plaintiffs clarify that their retaliatory prosecution claims are *not* based on McQueen's decision to prosecute Plaintiffs; rather, Plaintiffs' claims are based on McQueen's alleged fabrication of evidence that *caused* their prosecution.

The Court dismissed Plaintiffs' first amended complaint with respect to these allegations, because Plaintiffs failed to allege retaliatory animus against Bianchi (Order Granting Mot. Dismiss at 18 [195]), an essential element of a retaliatory prosecution claim. See *Hartman v. Moore*, 547 U.S. 250, 260-61 (2006). Plaintiffs' first amended complaint, the Court said, "allege[d] that Bianchi's Republican opponents wanted to

unseat him, but it [did] not say why McQueen – appointed by Judge Graham – should be counted among those political opponents.  In fact, the complaint [was] devoid of any allegation that Tonigan or McQueen (or any other Defendant) even knew of the Plaintiffs prior to their appointments by Judge Graham, much less had any political axe to grind or animus toward them."  Order Granting Mot. Dismiss at 18-19 [195].  *Id.*  The Court also noted that, "[a]ccepting Bianchi's characterization that he had 'political enemies,' it does not follow that the Court must assume that every action against him is improperly motivated."  *Id.*  Plaintiffs now seek to fill this void by alleging that "[d]uring the course of the investigation, Defendants McQueen and the Quest Investigators were secretly obtaining information from Bianchi's political enemies," (2nd Amend. Compl. ¶ 45) and "revealed confidential information to Bianchi's political enemies."  *Id.* at 86.  Further, Plaintiffs assert that "Defendants McQueen and the Quest Investigators concealed their relationship with these individuals until they were recently revealed through discovery on May 23, 2012 in the instant case."  *Id.* at ¶¶ 45, 86.

These supplemental allegations, however, do nothing to advance a theory that McQueen or the Quest Defendants behaved with any type of retaliatory or political animus or that they took any action whatsoever at the urging of Bianchi's supposed real "political enemies."  Viewing all facts in the light most favorable to Plaintiffs, they allege – at most – that McQueen and the Quest Defendants interviewed and communicated with the very individuals who petitioned the court for the appointment of a special prosecutor in the first place.  This is no surprise.  To the contrary, the Court would expect that these would be the first people whom the special prosecutors and their investigators would contact.  They would be the most likely starting point for such an investigation, because

they presumably would have information regarding the allegations and could point the special prosecution team to others with pertinent information. Plaintiffs have received more than 17,000 pages of discovery. Pl. Opp. to Quest Mot. [225] at 8. Yet all that they can allege at this point is that Defendants communicated during the course of their investigation with people who were essentially the complainants in the underlying case. Regardless, Plaintiffs' allegations lack an indispensable component of a retaliatory prosecution claim: "retaliatory animus as the cause of the injury." *Hartman*, 547 U.S. at 259-260. Accordingly, the Court concludes that Plaintiffs have failed to state any First Amendment violations, and Counts VI-VII are dismissed. For that reason, the Court need not address Defendants' argument that Synek, Salgado, and McCleary have failed to state First Amendment claims for their alleged prosecution in retaliation for *Bianchi's* decision to seek and hold office.

### B. State Law Claims

Plaintiffs have not stated a federal claim, and the Court must now decide whether to retain jurisdiction over Plaintiff's state law claims. See 28 U.S.C. § 1367(c)(3). The Seventh Circuit, animated by the principle of comity, consistently has stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly,* 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget Constr. Co.,* 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir. 1993); see also *Wright v. Associated Ins. Co.,* Inc., 29 F.3d 1244, 1251 (7th Cir. 1994) ("When all federal claims have been dismissed prior to trial, the principle

of comity encourages federal courts to relinquish supplemental jurisdiction * * * ”); see also *Horton v. Schultz,* 2010 WL 1541265, at *4 (N.D. Ill. 2010).

In *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251–53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are “unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point to a federal decision of the state-law claims on the merits.” The first example that the Court discussed occurs “when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court.” *Id.* at 1251. That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to re-file those claims in state court. See 735 ILCS 5/13–217; *Davis v. Cook County,* 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice of the state law claims also is appropriate here because the case is only at the motion to dismiss stage and substantial judicial resources have not been committed to the eight state law counts in Plaintiffs’ complaint. *Wright*, 29 F.3d at 1251. Finding no justification for departing from that “usual practice” in this case, the Court dismisses without prejudice Plaintiff’s state law claims without discussing their merit under state law.

IV. **Conclusion**

For the reasons stated above, Defendants’ motions to dismiss [210, 215] are granted, and Plaintiffs’ federal claims (Counts I – VII) are dismissed with prejudice. The Court will decline to exercise supplemental jurisdiction over Plaintiffs’ state law claims

(Counts VIII – XV), which are dismissed without prejudice to being refiled in state court.[3] Judgment will be entered in favor of Defendants and against Plaintiffs.


Dated:  February 24, 2014

_____
Robert M. Dow, Jr.
United States District Judge

---

[3] Illinois law gives Plaintiffs one year from a dismissal on jurisdictional grounds of state law claims in federal court in which to re-file those claims in state court.  See 735 ILCS 5/13-217.